# GODFREY *v.* GEORGIA

No. 78–6899.   Argued February 20, 1980—Decided May 19, 1980

STEWART, J., announced the judgment of the Court and delivered an opinion, in which BLACKMUN, POWELL, and STEVENS, JJ., joined. MARSHALL, J., filed an opinion concurring in the judgment, in which

BRENNAN, J., joined, *post*, p. 433. BURGER, C. J., filed a dissenting opinion, *post*, p. 442. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 444.

*J. Calloway Holmes, Jr.*, argued the cause for petitioner. With him on the brief was *Gerry E. Holmes.*

*John W. Dunsmore, Jr.*, Assistant Attorney General of Georgia, argued the cause for respondent. With him on the brief were *Arthur K. Bolton*, Attorney General, *Robert S. Stubbs II*, Executive Assistant Attorney General, *Don A. Langham*, First Assistant Attorney General, and *John C. Walden*, Senior Assistant Attorney General.

MR. JUSTICE STEWART announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE BLACKMUN, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS joined.

Under Georgia law, a person convicted of murder [1] may be sentenced to death if it is found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code § 27–2534.1 (b)(7) (1978). In *Gregg* v. *Georgia*, 428 U. S. 153, the Court held that this statutory aggravating circumstance (§ (b)(7)) is not unconstitutional on its face. Responding to the argument that the language of the provision is "so broad that capi-

---

[1] Georgia Code § 26–1101 (1978) defines "murder" as follows:

"(a) A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

"(b) A person also commits the crime of murder when in the commission of a felony he causes the death of another human being, irrespective of malice."

tal punishment could be imposed in any murder case," the joint opinion said:

> "It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." 428 U. S., at 201 (opinion of STEWART, POWELL, and STEVENS, JJ.).

Nearly four years have passed since the *Gregg* decision, and during that time many death sentences based in whole or in part on § (b)(7) have been affirmed by the Supreme Court of Georgia. The issue now before us is whether, in affirming the imposition of the sentences of death in the present case, the Georgia Supreme Court has adopted such a broad and vague construction of the § (b)(7) aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the United States Constitution.[2]

---

[2] The other statutory aggravating circumstances upon which a death sentence may be based after conviction of murder in Georgia are considerably more specific or objectively measurable than § (b)(7):

"(1) The offense of murder . . . was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

"(2) The offense of murder . . . was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

"(3) The offender by his act of murder . . . knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

"(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

"(5) The murder of a judicial officer, former judicial officer, district

# I

On a day in early September in 1977, the petitioner and his wife of 28 years had a heated argument in their home. During the course of this altercation, the petitioner, who had consumed several cans of beer, threatened his wife with a knife and damaged some of her clothing. At this point, the petitioner's wife declared that she was going to leave him, and departed to stay with relatives.[3] That afternoon she went to a Justice of the Peace and secured a warrant charging the petitioner with aggravated assault. A few days later, while still living away from home, she filed suit for divorce. Summons was served on the petitioner, and a court hearing was set on a date some two weeks later. Before the date of the hearing, the petitioner on several occasions asked his wife to return to their home. Each time his efforts were rebuffed.

---

attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

. . . . .

"(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

"(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

"(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." Ga. Code § 27–2534.1 (b) (1978).

In *Arnold* v. *State*, 236 Ga. 534, 540, 224 S. E. 2d 386, 391 (1976), the Supreme Court of Georgia held unconstitutional the portion of the first statutory aggravating circumstances encompassing persons who have a "substantial history of serious assaultive criminal convictions" because it did not set "sufficiently 'clear and objective standards.'"

[3] According to the petitioner, this was not the first time that he and his wife had been separated as a result of his violent behavior. On two or more previous occasions the petitioner had been hospitalized because of his drinking problem.

At some point during this period, his wife moved in with her mother. The petitioner believed that his mother-in-law was actively instigating his wife's determination not to consider a possible reconciliation.

In the early evening of September 20, according to the petitioner, his wife telephoned him at home. Once again they argued. She asserted that reconciliation was impossible and allegedly demanded all the proceeds from the planned sale of their house. The conversation was terminated after she said that she would call back later. This she did in an hour or so. The ensuing conversation was, according to the petitioner's account, even more heated than the first. His wife reiterated her stand that reconciliation was out of the question, said that she still wanted all the proceeds from the sale of their house, and mentioned that her mother was supporting her position. Stating that she saw no further use in talking or arguing, she hung up.

At this juncture, the petitioner got out his shotgun and walked with it down the hill from his home to the trailer where his mother-in-law lived. Peering through a window, he observed his wife, his mother-in-law, and his 11-year-old daughter playing a card game. He pointed the shotgun at his wife through the window and pulled the trigger. The charge from the gun struck his wife in the forehead and killed her instantly. He proceeded into the trailer, striking and injuring his fleeing daughter with the barrel of the gun. He then fired the gun at his mother-in-law, striking her in the head and killing her instantly.

The petitioner then called the local sheriff's office, identified himself, said where he was, explained that he had just killed his wife and mother-in-law, and asked that the sheriff come and pick him up. Upon arriving at the trailer, the law enforcement officers found the petitioner seated on a chair in open view near the driveway. He told one of the officers that "they're dead, I killed them" and directed the officer to the place where he had put the murder weapon. Later the

petitioner told a police officer: "I've done a hideous crime, . . . but I have been thinking about it for eight years . . . I'd do it again."

The petitioner was subsequently indicted on two counts of murder and one count of aggravated assault. He pleaded not guilty and relied primarily on a defense of temporary insanity at his trial. The jury returned verdicts of guilty on all three counts.

The sentencing phase of the trial was held before the same jury. No further evidence was tendered, but counsel for each side made arguments to the jury. Three times during the course of his argument, the prosecutor stated that the case involved no allegation of "torture" or of an "aggravated battery." When counsel had completed their arguments, the trial judge instructed the jury orally and in writing on the standards that must guide them in imposing sentence. Both orally and in writing, the judge quoted to the jury the statutory language of the § (b)(7) aggravating circumstance in its entirety.

The jury imposed sentences of death on both of the murder convictions. As to each, the jury specified that the aggravating circumstance they had found beyond a reasonable doubt was "that the offense of murder was outrageously or wantonly vile, horrible and inhuman."

In accord with Georgia law in capital cases, the trial judge prepared a report in the form of answers to a questionnaire for use on appellate review. One question on the form asked whether or not the victim had been "physically harmed or tortured." The trial judge's response was "No, as to both victims, excluding the actual murdering of the two victims."[4]

The Georgia Supreme Court affirmed the judgments of the trial court in all respects. 243 Ga. 302, 253 S. E. 2d 710

---

[4] Another question on the form asked the trial judge to list the mitigating circumstances that were in evidence. The judge noted that the petitioner had no significant history of prior criminal activity.

(1979). With regard to the imposition of the death sentence for each of the two murder convictions, the court rejected the petitioner's contention that § (b)(7) is unconstitutionally vague. The court noted that Georgia's death penalty legislation had been upheld in *Gregg* v. *Georgia,* 428 U. S. 153, and cited its prior decisions upholding § (b)(7) in the face of similar vagueness challenges. 243 Ga., at 308–309, 253 S. E. 2d, at 717. As to the petitioner's argument that the jury's phraseology was, as a matter of law, an inadequate statement of § (b)(7), the court responded by simply observing that the language "was not objectionable." 243 Ga., at 310, 253 S. E. 2d, at 718. The court found no evidence that the sentence had been "imposed under the influence of passion, prejudice, or any other arbitrary factor," held that the sentence was neither excessive nor disproportionate to the penalty imposed in similar cases, and stated that the evidence suported the jury's finding of the § (b)(7) statutory aggravating circumstance. 243 Ga., at 309–311, 253 S. E. 2d, at 717–718. Two justices dissented.

## II

In *Furman* v. *Georgia,* 408 U. S. 238, the Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. *Gregg* v. *Georgia, supra,* reaffirmed this holding:

> "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to, minimize the risk of wholly arbitrary and capricious action." 428 U. S., at 189 (opinion of STEWART, POWELL, and STEVENS, JJ.).

A capital sentencing scheme must, in short, provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' "

*Id.*, at 188, quoting *Furman* v. *Georgia, supra,* at 313 (WHITE, J., concurring).

This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." *Gregg* v. *Georgia, supra,* at 196, n. 47. See also *Proffitt* v. *Florida,* 428 U. S. 242; *Jurek* v. *Texas,* 428 U. S. 262. It must channel the sentencer's discretion by "clear and objective standards"[5] that provide "specific and detailed guidance,"[6] and that "make rationally reviewable the process for imposing a sentence of death."[7] As was made clear in *Gregg,* a death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." 428 U. S., at 195, n. 46.

In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman."[8] There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost

---

[5] *Gregg* v. *Georgia,* 428 U. S., at 198, quoting *Coley* v. *State,* 231 Ga. 829, 834, 204 S. E. 2d 612, 615 (1974).

[6] *Proffitt* v. *Florida,* 428 U. S., at 253 (opinion of STEWART, POWELL, and STEVENS, JJ.).

[7] *Woodson* v. *North Carolina,* 428 U. S. 280, 303 (opinion of STEWART, POWELL, and STEVENS, JJ.).

[8] See also *Ruffin* v. *State,* 243 Ga. 95, 106–107, 252 S. E. 2d 472, 480 (1979); *Hill* v. *State,* 237 Ga. 794, 802, 229 S. E. 2d 737, 742–743 (1976). Cf. *Holton* v. *State,* 243 Ga. 312, 318, 253 S. E. 2d 736, 740 (1979).

every murder as "outrageously or wantonly vile, horrible and inhuman." Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation.

The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court. Under state law that court may not affirm a judgment of death until it has independently assessed the evidence of record and determined that such evidence supports the trial judge's or jury's finding of an aggravating circumstance. Ga. Code § 27–2537 (c)(2) (1978).

In past cases the State Supreme Court has apparently understood this obligation as carrying with it the responsibility to keep § (b)(7) within constitutional bounds. Recognizing that "there is a possibility of abuse of [the § (b)(7)] statutory aggravating circumstance," the court has emphasized that it will not permit the language of that subsection simply to become a "catchall" for cases which do not fit within any other statutory aggravating circumstance. *Harris* v. *State*, 237 Ga. 718, 732, 230 S. E. 2d 1, 10 (1976). Thus, in exercising its function of death sentence review, the court has said that it will restrict its "approval of the death penalty under this statutory aggravating circumstance to those cases that lie at the core." *Id.*, at 733, 230 S. E. 2d, at 11.

When *Gregg* was decided by this Court in 1976, the Georgia Supreme Court had affirmed two death sentences based wholly on § (b)(7). See *McCorquodale* v. *State*, 233 Ga. 369, 211 S. E. 2d 577 (1974); *House* v. *State*, 232 Ga. 140, 205 S. E. 2d 217 (1974). The homicide in *McCorquodale* was "a horrify-

ing torture-murder." [9]  There, the victim had been beaten, burned, raped, and otherwise severely abused before her death by strangulation. The homicide in *House* was of a similar ilk. In that case, the convicted murderer had choked two 7-year-old boys to death after having forced each of them to submit to anal sodomy.

Following our decision in *Gregg,* the Georgia Supreme Court for the first time articulated some of the conclusions it had reached with respect to § (b)(7):

> "This aggravating circumstance involves both the effect on the victim, viz., torture, or an aggravated battery; and the offender, viz., depravity of mind. As to both parties the test is that the acts (the offense) were outrageously or wantonly vile, horrible or inhuman.

> .        .        .        .        .

> "We believe that each of [the cases decided to date that has relied exclusively on § (b)(7) [10]] establishes beyond any reasonable doubt a depravity of mind and either involved torture or an aggravated battery to the victim as illustrating the crimes were outrageously or wantonly vile, horrible or inhuman. Each of the cases is at the core and not the periphery. . . ." *Harris* v. *State, supra,* at 732–733, 230 S. E. 2d, at 10–11.

Subsequently, in *Blake* v. *State,* 239 Ga. 292, 236 S. E. 2d 637 (1977), the court elaborated on its understanding of § (b)(7). There, the contention was that a jury's finding of the aggravating circumstance could never be deemed unanimous without a polling of each member of the panel. The court said:

> "We find no significant dissimilarity between outrageously vile, wantonly vile, horrible or inhuman. Con-

[9] *Gregg* v. *Georgia, supra,* at 201.

[10] *Banks* v. *State,* 237 Ga. 325, 227 S. E. 2d 380 (1976); *McCorquodale* v. *State,* 233 Ga. 369, 211 S. E. 2d 577 (1974); *House* v. *State,* 232 Ga. 140, 205 S. E. 2d 217 (1974).

sidering torture and aggravated battery on the one hand as substantially similar treatment of the victim and depravity of mind on the other hand as relating to the defendant, we find no room for nonunanimous verdicts for the reason that there is no prohibition upon measuring cause on the one hand by effect on the other hand. That is to say, the depravity of mind contemplated by the statute is that which results in torture or aggravated battery to the victim. . . ." 239 Ga., at 299, 236 S. E. 2d, at 643.[11]

The *Harris* and *Blake* opinions suggest that the Georgia Supreme Court had by 1977 reached three separate but consistent conclusions respecting the § (b)(7) aggravating circumstance. The first was that the evidence that the offense was "outrageously or wantonly vile, horrible or inhuman" had to demonstrate "torture, depravity of mind, or an aggravated battery to the victim."[12] The second was that the phrase, "depravity of mind," comprehended only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim. The third, derived from *Blake* alone, was that the word, "torture," must be construed *in pari materia* with "aggravated battery" so as to require evidence of serious physical abuse of the victim before death.[13] Indeed, the circumstances proved in a num-

---

[11] Since *Harris* and *Blake*, the court has summarily rejected all constitutional challenges to its construction of § (b)(7). See, *e. g.*, *Baker* v. *State*, 243 Ga. 710, 711–712, 257 S. E. 2d 192, 193–194 (1979); *Collins* v. *State*, 243 Ga. 291, 294, 253 S. E. 2d 729, 732 (1979); *Johnson* v. *State*, 242 Ga. 649, 651, 250 S. E. 2d 394, 397–398 (1978); *Lamb* v. *State*, 241 Ga. 10, 15, 243 S. E. 2d 59, 63 (1978).

[12] This construction of § (b)(7) finds strong support in the language and structure of the statutory provision.

[13] "Aggravated battery" is a term that is defined in Georgia's criminal statutes. Georgia Code § 26–1305 (1978) states: "A person commits aggravated battery when he maliciously causes bodily harm to another by depriving him of a member of his body, or by rendering a member of his

ber of the § (b)(7) death sentence cases affirmed by the Georgia Supreme Court have met all three of these criteria.[14]

The Georgia courts did not, however, so limit § (b)(7) in the present case. No claim was made, and nothing in the record before us suggests, that the petitioner committed an aggravated battery upon his wife or mother-in-law or, in fact, caused either of them to suffer any physical injury preceding their deaths. Moreover, in the trial court, the prosecutor repeatedly told the jury—and the trial judge wrote in his sentencing report—that the murders did not involve "torture." Nothing said on appeal by the Georgia Supreme Court indicates that it took a different view of the evidence. The circumstances of this case, therefore, do not satisfy the criteria laid out by the Georgia Supreme Court itself in the *Harris* and *Blake* cases. In holding that the evidence supported the jury's § (b)(7) finding, the State Supreme Court simply asserted that the verdict was "factually substantiated."

Thus, the validity of the petitioner's death sentences turns on whether, in light of the facts and circumstances of the murders that he was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the phrase "outrageously or wantonly vile, horrible or inhuman in that [they] involved . . . depravity of mind. . . ." [15] We conclude that the answer must be no.

---

body useless, or by seriously disfiguring his body or a member thereof." It appears that this definition has on at least one occasion been treated by the state trial courts as controlling the meaning of the same words in § (b)(7). See, *e. g., Holton* v. *State,* 243 Ga., at 317, n. 1, 253 S. E. 2d, at 740, n. 1.

We note, however, that the *Harris* case apparently did not involve "torture" in this sense.

[14] See, *e. g., Thomas* v. *State,* 240 Ga. 393, 242 S. E. 2d 1 (1977); *Stanley* v. *State,* 240 Ga. 341; 241 S. E. 2d 173 (1977); *Dix* v. *State,* 238 Ga. 209, 232 S. E. 2d 47 (1977); *Birt* v. *State,* 236 Ga. 815, 225 S. E. 2d 248 (1976); *McCorquodale* v. *State, supra.*

[15] The sentences of death in this case rested exclusively on § (b)(7). Accordingly, we intimate no view as to whether or not the petitioner might

The petitioner's crimes cannot be said to have reflected a consciousness materially more "depraved" than that of any person guilty of murder. His victims were killed instantaneously.[16] They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner* v. *Florida,* 430 U. S. 349, 358, it "is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."

That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. Accordingly, the judgment of the Georgia Supreme Court insofar as it leaves standing the petitioner's death sentences is reversed, and the case is remanded to that court for further proceedings.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in the judgment.

I continue to believe that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments. In addition, I agree with the plurality that the Georgia Supreme Court's construction of the provision at issue in this case is unconstitutionally vague under *Gregg* v. *Georgia,* 428 U. S. 153 (1976). I write

---

constitutionally have received the same sentences on some other basis. Georgia does not, as do some States, make multiple murders an aggravating circumstance, as such.

[16] In light of this fact, it is constitutionally irrelevant that the petitioner used a shotgun instead of a rifle as the murder weapon, resulting in a gruesome spectacle in his mother-in-law's trailer. An interpretation of § (b)(7) so as to include all murders resulting in gruesome scenes would be totally irrational.

separately, first, to examine the Georgia Supreme Court's application of this provision, and second, to suggest why the enterprise on which the Court embarked in *Gregg* v. *Georgia, supra,* increasingly appears to be doomed to failure.

## I

Under Georgia law, the death penalty may be imposed only when the jury both finds at least one statutory aggravating circumstance and recommends that the sentence of death should be imposed. Ga. Code § 26–3102 (1978). Under Ga. Code § 27–2534.1 (b)(7) (1978), it is a statutory aggravating circumstance to commit a murder that "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." In *Gregg* v. *Georgia, supra,* the Court rejected a facial challenge to the constitutionality of this aggravating circumstance. The joint opinion conceded that it is "arguable that any murder involves depravity of mind or an aggravated battery." 428 U. S., at 201 (opinion of STEWART, POWELL, and STEVENS, JJ.). Nonetheless, that opinion refused to invalidate the provision on its face, reasoning that the statutory "language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." *Ibid.* In my view, life and death should not be determined by such niceties of language.

The Court's conclusion in *Gregg* was not unconditional; it was expressly based on the assumption that the Georgia Supreme Court would adopt a narrowing construction that would give some discernible content to § (b)(7). In the present case, no such narrowing construction was read to the jury or applied by the Georgia Supreme Court on appeal. As it has so many times in the past, that court upheld the jury's finding with a simple notation that it was supported by the evidence. The premise on which *Gregg* relied has thus proved demonstrably false.

For this reason, I readily agree with the plurality that, as applied in this case, § (b)(7) is unconstitutionally vague.[1] The record unequivocally establishes that the trial judge, the prosecutor, and the jury did not believe that the evidence showed that either victim was tortured. Nor was there aggravated battery to the victims.[2] I also agree that since the victims died instantaneously and within a few moments of each other, the fact that the murder weapon was one which caused extensive damage to the victim's body is constitutionally irrelevant. *Ante,* at 433, n. 16.

I am unwilling, however, to accept the plurality's characterization of the decision below as an aberrational lapse on the part of the Georgia Supreme Court from an ordinarily narrow construction of § (b)(7). Reasoning from two decisions rendered shortly after our decision in *Gregg, Blake* v. *State,* 239 Ga. 292, 236 S. E. 2d 637 (1977), and *Harris* v. *State,* 237 Ga. 718, 230 S. E. 2d 1 (1976), the plurality suggests that from 1977 onward it has been the law of Georgia that a statutory aggravating circumstance can be found under § (b)(7) only if the offense involved torture and aggravated battery, manifested by "evidence of serious physical abuse of

---

[1] My Brother WHITE appears to mischaracterize today's holding in suggesting that a "majority of this Court disagrees" with the conclusion that the "facts supported the jury's finding of the existence of statutory aggravating circumstance § (b)(7)." *Post,* at 449. The question is not whether the facts support the jury's finding. As in any case raising issues of vagueness, the question is whether the court below has adopted so ambiguous a construction of the relevant provision that the universe of cases that it comprehends is impermissibly large, thus leaving undue discretion to the decisionmaker and creating intolerable dangers of arbitrariness and caprice.

[2] Georgia Code § 26–1305 (1978) provides, in pertinent part: "A person commits aggravated battery when he maliciously causes bodily harm to another by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof."

the victim before death." *Ante,* at 431.[3]   But we cannot stop reading the Georgia Reports after those two cases.   In *Ruffin* v. *State,* 243 Ga. 95, 252 S. E. 2d 472 (1979), the court upheld a jury finding of a § (b)(7) aggravating circumstance stated in the words, "we the jurors conclude that this act was both horrible and inhuman."   The case involved a shotgun murder of a child: no torture or aggravated battery was present.   See also *Holton* v. *State,* 243 Ga. 312, 253 S. E. 2d 736, cert. denied, 444 U. S. 925 (1979).[4]   The Georgia court's cursory treatment of § (b)(7) in *Ruffin, Holton,* and the present case indicates either that it has abandoned its intention of reaching only "core" cases under § (b)(7) or that its understanding of the "core" has become remarkably inclusive.

In addition, I think it necessary to emphasize that even under the prevailing view that the death penalty may, in some circumstances, constitutionally be imposed, it is not enough for a reviewing court to apply a narrowing construction to

---

[3] My Brother WHITE also assumes that § (b)(7) "applie[s] in its entirety," *post,* at 448, so that the aggravating circumstance cannot be found unless the jury finds torture, depravity of mind, or aggravated battery to the victim.

[4] In *Holton* v. *State,* the defendant murdered a husband and wife.   Both victims died of gunshot wounds.   The husband had sustained wounds to his ear and shoulder which were apparently caused by blows from a tomahawk.   The wife had been stabbed in the back and her ear almost severed after she died.   The jury was instructed in the language of § (b)(7), but the word "torture" was omitted since there was no evidence of torture before the deaths occurred.   The court also instructed the jury on the statutory definition of aggravated battery, but informed them that they could not find an aggravated battery to the wife.   The jury found as an aggravating circumstance the fact that the murder was committed "by reason of depravity of mind."   The Georgia Supreme Court indicated in dictum that the omission of the words "outrageously or wantonly vile, horrible or inhuman," rendered the finding impermissibly vague, but did not comment on the instructions to the jury.   Apparently, then, the court would have permitted the jury to find that the murder of the wife fell within § (b)(7) even though there was neither torture nor aggravated battery.   See also n. 11, *infra.*

otherwise ambiguous statutory language. The jury must be instructed on the proper, narrow construction of the statute. The Court's cases make clear that it is the *sentencer's* discretion that must be channeled and guided by clear, objective, and specific standards. See *ante,* at 428. To give the jury an instruction in the form of the bare words of the statute—words that are hopelessly ambiguous and could be understood to apply to any murder, see *ante,* at 428–429; *Gregg* v. *Georgia,* 428 U. S., at 201—would effectively grant it unbridled discretion to impose the death penalty. Such a defect could not be cured by the *post hoc* narrowing construction of an appellate court. The reviewing court can determine only whether a rational jury might have imposed the death penalty if it had been properly instructed; it is impossible for it to say whether a particular jury would have so exercised its discretion if it had known the law.

For this reason, I believe that the vices of vagueness and intolerably broad discretion are present in any case in which an adequate narrowing construction of § (b)(7) was not read to the jury, and the Court's decision today cannot properly be restricted to cases in which the particular facts appear to be insufficiently heinous to fall within a construction of § (b)(7) that would be consistent with *Gregg.*

## II

The preceding discussion leads me to what I regard as a more fundamental defect in the Court's approach to death penalty cases. In *Gregg,* the Court rejected the position, expressed by my Brother BRENNAN and myself, that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments. Instead it was concluded that in "a matter so grave as the determination of whether a human life should be taken or spared," it would be both necessary and sufficient to insist on sentencing procedures that would minimize or eliminate the

"risk that [the death penalty] would be inflicted in an arbitrary and capricious manner." 428 U. S., at 189, 188 (opinion of STEWART, POWELL, and STEVENS, JJ.). Contrary to the statutes at issue in *Furman* v. *Georgia,* 408 U. S. 238 (1972), under which the death penalty was "infrequently imposed" upon "a capriciously selected random handful," *id.,* at 309–310 (STEWART, J., concurring), and "the threat of execution [was] too attenuated to be of substantial service to criminal justice," *id.,* at 311–313 (WHITE, J., concurring), it was anticipated that the Georgia scheme would produce an evenhanded, objective procedure rationally " 'distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg* v. *Georgia, supra,* at 198, quoting *Furman, supra,* at 313 (WHITE, J., concurring).

For reasons I expressed in *Furman* v. *Georgia, supra,* at 314–371 (concurring opinion), and *Gregg* v. *Georgia, supra,* at 231–241 (dissenting opinion), I believe that the death penalty may not constitutionally be imposed even if it were possible to do so in an evenhanded manner. But events since *Gregg* make that possibility seem increasingly remote. Nearly every week of every year, this Court is presented with at least one petition for certiorari raising troubling issues of noncompliance with the strictures of *Gregg* and its progeny. On numerous occasions since *Gregg,* the Court has reversed decisions of State Supreme Courts upholding the imposition of capital punishment,[5] frequently on the ground that the sentencing proceeding allowed undue discretion, causing dangers

---

[5] See, *e. g., Green* v. *Georgia,* 442 U. S. 95 (1979); *Presnell* v. *Georgia,* 439 U. S. 14 (1978); *Bell* v. *Ohio,* 438 U. S. 637 (1978); *Lockett* v. *Ohio,* 438 U. S. 586 (1978); *Downs* v. *Ohio,* 438 U. S. 909 (1978); *Shelton* v. *Ohio,* 438 U. S. 909 (1978); *Woods* v. *Ohio,* 438 U. S. 910 (1978); *Roberts* v. *Ohio,* 438 U. S. 910 (1978); *Jordan* v. *Arizona,* 438 U. S. 911 (1978); *Coker* v. *Georgia,* 433 U. S. 584 (1977); *Eberheart* v. *Georgia,* 433 U. S. 917 (1977); *Hooks* v. *Georgia,* 433 U. S. 917 (1977); *Gardner* v. *Florida,* 430 U. S. 349 (1977); *Davis* v. *Georgia,* 429 U. S. 122 (1976).

of arbitrariness in violation of *Gregg* and its companion cases. These developments, coupled with other persuasive evidence,[6] strongly suggest that appellate courts are incapable of guaranteeing the kind of objectivity and evenhandedness that the Court contemplated and hoped for in *Gregg*. The disgraceful distorting effects of racial discrimination and poverty continue to be painfully visible in the imposition of death sentences.[7] And while hundreds have been placed on death row in the years since *Gregg*,[8] only three persons have been executed.[9] Two of them made no effort to challenge their sentence and were thus permitted to commit what I have elsewhere described as "state-administered suicide." *Lenhard*

[6] See generally Dix, Appellate Review of the Decision To Impose Death, 68 Geo. L. J. 97 (1979). Professor Dix's meticulous study of the process of appellate review in Georgia, Florida, and Texas since 1976 demonstrates that "objective standards" for the imposition of the death penalty have not been achieved and probably are impossible to achieve, and concludes that *Gregg* and its companion cases "mandate pursuit of an impossible goal." 68 Geo. L. J., at 161.

[7] On April 20, 1980, for example, over 40% of the persons on death row were Negroes. See NAACP Legal Defense and Educational Fund, Death Row, U. S. A., 1 (Apr. 20, 1980). See also U. S. Department of Justice, Capital Punishment 1978, pp. 25–30 (1979); *Furman* v. *Georgia*, 408 U. S. 238, 249–257 (1972) (Douglas, J., concurring).

[8] See NAACP Legal Defense and Educational Fund, Death Row, U. S. A. (Apr. 20, 1980) (642 people on death row); U. S. Department of Justice, Capital Punishment 1978, p. 1 (1979) (445 people on death row as of December 31, 1978).

[9] In *Furman*, my Brothers STEWART and WHITE concurred in the judgment largely on the ground that the death penalty had been so infrequently imposed that it made no contribution to the goals of punishment. MR. JUSTICE STEWART stated that "the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Furman* v. *Georgia*, 408 U. S., at 309–310. MR. JUSTICE WHITE relied on his conclusion that "the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice." *Id.*, at 313. These conclusions have proved to be equally valid under the sentencing schemes upheld in *Gregg*.

v. *Wolff,* 444 U. S. 807, 815 (1979) (dissenting opinion). See also *Gilmore* v. *Utah,* 429 U. S. 1012 (1976). The task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system—and perhaps any criminal justice system—is unable to perform.[10]  In short, it is now apparent that the defects that led my Brothers Douglas, STEWART, and WHITE to concur in the judgment in *Furman* are present as well in the statutory schemes under which defendants are currently sentenced to death.

The issue presented in this case usefully illustrates the point.  The Georgia Supreme Court has given no real content to § (b)(7) in by far the majority of the cases in which it has had an opportunity to do so.  In the four years since *Gregg,* the Georgia court has *never* reversed a jury's finding of a § (b)(7) aggravating circumstance.[11]  With considerable frequency the Georgia court has, as here, upheld the imposition of the death penalty on the basis of a simple conclusory statement that the evidence supported the jury's finding under § (b)(7).[12]  Instances of a narrowing construction are difficult

[10] See C. Black, Capital Punishment: The Inevitability of Caprice and Mistake (1974); Black, Due Process for Death: *Jurek v. Texas* and Companion Cases, 26 Cath. U. L. Rev. 1 (1976).

[11] In *Holton* v. *State,* 243 Ga. 312, 253 S. E. 2d 736, cert. denied, 444 U. S. 925 (1979), the court reversed a sentence of death on the grounds that the trial judge had given an inadequate charge on mitigating circumstances and that the jury had not been informed that it could recommend a life sentence even though it found a statutory aggravating circumstance.  Although in dictum it indicated disapproval of a statutory circumstance based solely on depravity of mind, the court did not reverse the jury's finding under § (b)(7).  See also n. 4, *supra.*

[12] See *Willis* v. *State,* 243 Ga. 185, 253 S. E. 2d 70, cert. denied, 444 U. S. 885 (1979); *Baker* v. *State,* 243 Ga. 710, 257 S. E. 2d 192 (1979); *Legare* v. *State,* 243 Ga. 744, 257 S. E. 2d 247, cert. denied, 444 U. S. 984 (1979); *Green* v. *State,* 242 Ga. 261, 249 S. E. 2d 1 (1978), rev'd on other grounds, 442 U. S. 95 (1979); *Young* v. *State,* 239 Ga. 53, 236 S. E. 2d 1, cert. denied, 434 U. S. 1002 (1977); *Gaddis* v. *State,* 239 Ga. 238, 236 S. E. 2d

to find, and those narrowing constructions that can be found have not been adhered to with any regularity. In no case has the Georgia court required a narrowing construction to be given to the jury—an indispensable method for avoiding the "standardless and unchanneled imposition of death sentences." *Ante*, at 429. Genuinely independent review has been exceedingly rare. In sum, I agree with the analysis of a recent commentator who, after a careful examination of the Georgia cases, concluded that the Georgia court has made no substantial effort to limit the scope of § (b)(7), but has instead defined the provision so broadly that practically every murder can fit within its reach. See Dix, Appellate Review of the Decision To Impose Death, 68 Geo. L. J. 97, 110–123 (1979).

The Georgia court's inability to administer its capital punishment statute in an evenhanded fashion is not necessarily attributable to any bad faith on its part; it is, I believe, symptomatic of a deeper problem that is proving to be genuinely intractable. Just five years before *Gregg*, Mr. Justice Harlan stated for the Court that the tasks of identifying "before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and [of] express[ing] these characteristics in language which can be

---

594 (1977), cert. denied, 434 U. S. 1088 (1978); *Davis* v. *State*, 236 Ga. 804, 225 S. E. 2d 241, rev'd on other grounds, 429 U. S. 122 (1976); *Jarrell* v. *State*, 234 Ga. 410, 216 S. E. 2d 258 (1975), cert. denied, 428 U. S. 910 (1976); *Floyd* v. *State*, 233 Ga. 280, 210 S. E. 2d 810 (1974), cert. denied, 431 U. S. 949 (1977); *House* v. *State*, 232 Ga. 140, 205 S. E. 2d 217 (1974), cert. denied, 428 U. S. 910 (1976). The Georgia court has given an extraordinarily broad meaning to the word "torture." Under that court's view, "torture" may be present whenever the victim suffered pain or anticipated the prospect of death. See *Campbell* v. *State*, 240 Ga. 352, 240 S. E. 2d 828 (1977), cert. denied, 439 U. S. 882 (1978); *Blake* v. *State*, 239 Ga. 292, 236 S. E. 2d 637, cert. denied, 434 U. S. 960 (1977); *Banks* v. *State*, 237 Ga. 325, 227 S. E. 2d 380 (1976), cert. denied, 430 U. S. 975 (1977). That interpretation would of course enable a jury to find a § (b)(7) aggravating circumstance in most murder cases.

fairly understood and applied by the sentencing authority, appear to be . . . beyond present human ability." *McGautha* v. *California,* 402 U. S. 183, 204 (1971). From this premise, the Court in *McGautha* drew the conclusion that the effort to eliminate arbitrariness in the imposition of the death penalty need not be attempted at all. In *Furman,* the Court concluded that the arbitrary infliction of the death penalty was constitutionally intolerable. And in *Gregg,* the Court rejected the premise of *McGautha* and approved a statutory scheme under which, as the Court then perceived it, the death penalty would be imposed in an evenhanded manner.

There can be no doubt that the conclusion drawn in *McGautha* was properly repudiated in *Furman,* where the Court made clear that the arbitrary imposition of the death penalty is forbidden by the Eighth and Fourteenth Amendments. But I believe that the Court in *McGautha* was substantially correct in concluding that the task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system. For this reason, I remain hopeful that even if the Court is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty— must be abandoned altogether.

MR. CHIEF JUSTICE BURGER, dissenting.

After murdering his wife and mother-in-law, petitioner informed the police that he had committed a "hideous" crime. The dictionary defines hideous as "morally offensive," "shocking," or "horrible." Thus, the very curious feature of this case is that petitioner himself characterized his crime in terms equivalent to those employed in the Georgia statute. For

my part, I prefer petitioner's characterization of his conduct
to the plurality's effort to excuse and rationalize that con-
duct as just another killing.  *Ante,* at 433.   The jurors in this
case, who heard all relevant mitigating evidence, see *Lockett* v.
*Ohio,* 438 U. S. 586 (1978), obviously shared that preference;
they concluded that this "hideous" crime was "outrageously
or wantonly vile, horrible and inhuman" within the meaning
of § (b)(7).

More troubling than the plurality's characterization of peti-
tioner's crime is the new responsibility that it assumes with
today's decision—the task of determining on a case-by-case
basis whether a defendant's conduct is egregious enough to
warrant a death sentence.   In this new role, the plurality
appears to require "evidence of serious physical abuse" before a
death sentence can be imposed under § (b)(7).   *Ante,* at 431.
For me, this new requirement is arbitrary and unfounded and
trivializes the Constitution.   Consider, for example, the
Georgia case of *Harris* v. *State,* 237 Ga. 718, 230 S. E. 2d 1
(1976), where the defendant killed a young woman for the
thrill of it.   As he later confessed, he "didn't want nothing
[she] got except [her] life."   *Id.,* at 720, 230 S. E. 2d, at 4.
Does the plurality opinion mean to suggest that anything in
the Constitution precludes a state from imposing a death sen-
tence on such a merciless, gratuitous killer?   The plurality's
novel physical torture requirement may provide an "objec-
tive" criterion, but it hardly separates those for whom a state
may prescribe the death sentence from those for whom it may
not.

In short, I am convinced that the course the plurality
embarks on today is sadly mistaken—indeed confused.   It is
this Court's function to insure that the rights of a defendant
are scrupulously respected; and in capital cases we must see
to it that the jury has rendered its decision with meticulous
care.   But it is emphatically not our province to second-guess
the jury's judgment or to tell the states which of their "hide-

ous," intentional murderers may be given the ultimate penalty. Because the plurality does both, I dissent.

MR. JUSTICE WHITE, with whom MR. JUSTICE REHNQUIST joins, dissenting.

The sole question presented by this petition is whether, in affirming petitioner's death sentence, the Georgia Supreme Court adopted such a broad construction of Ga. Code § 27–2534.1 (b)(7) (1978) as to violate the Eighth and Fourteenth Amendments to the United States Constitution.

## I

In early September 1977, Mrs. Godfrey, petitioner's wife, left him, moved in with her mother, and refused his entreaty to move back home. She also filed for divorce and charged petitioner with aggravated assault based on an incident in which he had cut some clothes off her body with a knife. On September 20, 1977, Mrs. Godfrey refused petitioner's request to halt divorce proceedings so that they could attempt a reconciliation. That same day petitioner carried his single-action shotgun to his mother-in-law's trailer home, where his wife, her mother, and the couple's 11-year-old daughter were playing a game around a table. Firing through a window, petitioner killed his wife with a shotgun blast to the head. As his daughter, running for help, attempted to rush past him, he struck her on the head with the barrel of the gun; she nonetheless was able to run on for help. Petitioner then reloaded his shotgun and, after entering the home, fired a fatal blast at his mother-in-law's head. After calling the police himself, petitioner was arrested, advised of his rights, and taken to the police station, where he told an officer that he had committed a "hideous crime" about which he had thought for eight years and that he would do it again.

Petitioner, over his defense of insanity, was convicted of the murders of his wife and his mother-in-law and of the

aggravated assault of his daughter. He was sentenced to death for each of the murders and to 10 years' imprisonment for the aggravated assault. Under the Georgia death penalty scheme, a person can be sentenced to death only if "the jury verdict includes a finding of at least one statutory aggravating circumstance and a recommendation that such sentence be imposed." Ga. Code § 26–3102 (1978). The statutory aggravating circumstance upon which petitioner's sentence was premised reads: "The offense of murder . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim." § 27–2534.1 (b)(7) ("§ (b)(7)"). In petitioner's case, however, the jury, upon returning its recommendation of death, described the aggravating circumstance as follows: "[T]hat the offense of murder was outrageously or wantonly vile, horrible and inhuman." This attenuated statement of § (b)(7) in part forms the basis of petitioner's challenge to the Georgia Supreme Court's decision, for that court held that "[t]he evidence supports the jury's finding of statutory aggravating circumstances, and the jury's phraseology was not objectionable." 243 Ga. 302, 310, 253 S. E. 2d 710, 718.

## II

In *Gregg* v. *Georgia,* 428 U. S. 153 (1976), we upheld the constitutionality of the capital-sentencing procedures in accordance with which the State of Georgia has sentenced petitioner to death. Two aspects of that scheme impressed us in particular as curing the constitutional defects in the system that was invalidated several years earlier in *Furman* v. *Georgia,* 408 U. S. 238 (1972). First, the sentencing system specifies statutory aggravating circumstances, one of which has to be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed. Ga. Code §§ 26–3102, 27–2534.1 (1978). Second, the scheme provides for automatic appeal of all death sentences to the

Georgia Supreme Court, which is required by statute to undertake a specific inquiry with respect to the soundness of the decision to impose the death penalty. § 27–2537.[1] "In short, Georgia's new sentencing procedures require as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant. Moreover, . . . the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate." 428 U. S., at 198 (opinion of STEWART, POWELL, and STEVENS, JJ.); see *id.,* at 204–206; *id.,* at 223–224 (opinion of WHITE, J.). Petitioner maintains that, at least in his case, the Georgia Supreme Court has failed in its review function because, by construing § (b)(7) to authorize the imposition of the death penalty on him, the court has interpreted that provision in an unconstitutionally broad fashion.

The opinion announcing the judgment of the Court in *Gregg* recognized that § (b)(7), which would authorize imposition of the death penalty here if either of the murders was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," presented some potential interpretative difficulty because "arguabl[y] . . . any murder involves depravity of mind or an aggravated battery." 428 U. S., at 201 (opinion of STEWART, POWELL, and STEVENS, JJ.). "But," the opinion continued, "this language need not be construed in this way, and there is no reason to assume

---

[1] According to the statute, the Georgia Supreme Court must determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27–2534.1 (b), and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ga. Code § 27–2537 (c) (1978).

that the Supreme Court of Georgia will adopt such an open-ended construction." *Ibid.* By concluding that the Supreme Court of Georgia has adopted "such an open-ended construction" in the present case, the Court has now turned a blind eye to the facts surrounding the murders of Mrs. Godfrey and her mother and to the constancy of the State Supreme Court in performance of its statutory review function.

## III

This case presents a preliminary difficulty because the sentencing jury found merely that "the offense of murder was outrageously or wantonly vile, horrible and inhuman," and did not repeat in its finding the entire incantation of § (b)(7). The Georgia Supreme Court found the jury's phraseology unobjectionable; and because this judgment was rendered in the same sentence in which the court expressed its determination that sufficient evidence supported the jury's finding of statutory aggravating circumstance § (b)(7), the court presumably believed that the jury's finding met all necessary terms of the provision notwithstanding the jury's abbreviated statement.

Petitioner argues, however, that the Georgia Supreme Court, by not deeming the jury's abbreviated statement as reversible error, has endorsed a view of § (b)(7) that allows for the provision's application upon a finding that a murder was "outrageously or wantonly vile, horrible or inhuman," even though the murder involved no "torture, depravity of mind, or . . . aggravated battery to the victim." Such a finding, petitioner contends, would be incomplete and indicative of an unconstitutionally broad construction of the provision, for the language "outrageously or wantonly vile, horrible or inhuman" cannot "objectively guide and channel jury discretion in the imposition of a death sentence in compliance with the command of the 8th and 14th Amendments. . . ." Brief for Petitioner 23. The plurality opinion seems to agree. *Ante,* at 428.

I find petitioner's argument unpersuasive, for it is apparent that both the jury and the Georgia Supreme Court understood and applied § (b)(7) in its entirety. The trial court instructed the jurors that they were authorized to fix petitioner's punishment for murder as death or imprisonment for life and that they could consider any evidence in mitigation. App. 79. They were also specifically instructed to determine whether there was a statutory aggravating circumstance present beyond a reasonable doubt and that the aggravating circumstance that they could consider was "[t]hat the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Ibid.* That the jury's ultimate recitation of the aggravating circumstance was abbreviated reveals, in my view, no gap of constitutional magnitude in its understanding of its duty. It is perfectly evident, moreover, that, in exercising its review function, the Georgia Supreme Court understood that the provision applied in its entirety, just as in the past it has insisted that the provision be read as a whole and not be applied disjunctively. *Harris* v. *State*, 237 Ga. 718, 230 S. E. 2d 1 (1976), cert. denied, 431 U. S 933 (1977); *Holton* v. *State*, 243 Ga. 312, 253 S. E. 2d 736 (a finding of "depravity of mind" is insufficient to support a death sentence), cert. denied, 444 U. S. 925 (1979). The court, after quoting the language of the jury's finding, cited § (b)(7) and, more tellingly, referred to the discrepancy between the two versions as a mere problem of "phraseology." As such, the jury's version, in the court's view, "was not objectionable." 243 Ga., at 310, 253 S. E. 2d, at 718.

Thus, while both sides to this litigation felt constrained to engage in elaborate structural arguments regarding § (b)(7)—focusing on grammar and syntax, nuance and implication—I ascribe no constitutional significance at all to the jury's attenuated statement of the provision, and thus regard the question whether certain language in the section is severable from the rest as immaterial to the decision of this case.

## IV

The question remains whether the facts of this case bear sufficient relation to § (b)(7) to conclude that the Georgia Supreme Court responsibly and constitutionally discharged its review function. I believe that they do.

As described earlier, petitioner, in a coldblooded executioner's style, murdered his wife and his mother-in-law and, in passing, struck his young daughter on the head with the barrel of his gun. The weapon, a shotgun, is hardly known for the surgical precision with which it perforates its target. The murder scene, in consequence, can only be described in the most unpleasant terms. Petitioner's wife lay prone on the floor. Mrs. Godfrey's head had a hole described as "[a]pproximately the size of a silver dollar" on the side where the shot entered, and much less decipherable and more extensive damage on the side where the shot exited. Tr. 259. Pellets that had passed through Mrs. Godfrey's head were found embedded in the kitchen cabinet.

It will be remembered that after petitioner inflicted this much damage, he took out time not only to strike his daughter on the head, but also to reload his single-shot shotgun and to enter the house. Only then did he get around to shooting his mother-in-law, Mrs. Wilkerson, whose last several moments as a sentient being must have been as terrifying as the human mind can imagine. The police eventually found her facedown on the floor with a substantial portion of her head missing and her brain, no longer cabined by her skull, protruding for some distance onto the floor. Blood not only covered the floor and table, but dripped from the ceiling as well.

The Georgia Supreme Court held that these facts supported the jury's finding of the existence of statutory aggravating circumstance § (b)(7). A majority of this Court disagrees. But this disagreement, founded as it is on the notion that the lower court's construction of the provision was overly broad, in fact reveals a conception of this Court's role in back-

stopping the Georgia Supreme Court that is itself overly broad. Our role is to correct genuine errors of constitutional significance resulting from the application of Georgia's capital sentencing procedures; our role is not to peer majestically over the lower court's shoulder so that we might second-guess its interpretation of facts that quite reasonably—perhaps even quite plainly—fit within the statutory language.[2]

Who is to say that the murders of Mrs. Godfrey and Mrs. Wilkerson were not "vile," or "inhuman," or "horrible"? In performing his murderous chore, petitioner employed a weapon known for its disfiguring effects on targets, human or other, and he succeeded in creating a scene so macabre and revolting that, if anything, "vile," "horrible," and "inhuman" are descriptively inadequate.

And who among us can honestly say that Mrs. Wilkerson did not feel "torture" in her last sentient moments. Her daughter, an instant ago a living being sitting across the table from Mrs. Wilkerson, lay prone on the floor, a bloodied and mutilated corpse. The seconds ticked by; enough time for her son-in-law to reload his gun, to enter the home, and to

---

[2] The plurality opinion, *ante*, at 433, and n. 16, states that "[a]n interpretation of § (b)(7) so as to include all murders resulting in gruesome scenes would be totally irrational" and that the fact that both "victims were killed instantaneously" makes the gruesomeness of the scene irrelevant. This view ignores the indisputable truth that Mrs. Wilkerson did not die "instantaneously"; she had many moments to contemplate her impending death, assuming that the stark terror she must have felt permitted any contemplation. More importantly, it also ignores the obvious correlation between gruesomeness and "depravity of mind," between gruesomeness and "aggravated battery," between gruesomeness and "horrible," between gruesomeness and "vile," and between gruesomeness and "inhuman." Mere gruesomeness, to be sure, would not itself serve to establish the existence of statutory aggravating circumstance § (b)(7). But it certainly fares sufficiently well as an indicator of this particular aggravating circumstance to signal to a reviewing court the distinct possibility that the terms of the provision, upon further investigation, might well be met in the circumstances of the case.

take a gratuitous swipe at his daughter. What terror must have run through her veins as she first witnessed her daughter's hideous demise and then came to terms with the imminence of her own. Was this not torture? And if this was not torture, can it honestly be said that petitioner did not exhibit a "depravity of mind" in carrying out this cruel drama to its mischievous and murderous conclusion? I should have thought, moreover, that the Georgia court could reasonably have deemed the scene awaiting the investigating policemen as involving "an aggravated battery to the victim[s]." Ga. Code § 27–2534.1 (b)(7) (1978).

The point is not that, in my view, petitioner's crimes were definitively vile, horrible, or inhuman, or that, as I assay the evidence, they beyond *any* doubt involved torture, depravity of mind, or an aggravated battery to the victims. Rather, the lesson is a much more elementary one, an instruction that, I should have thought, this Court would have taken to heart long ago. Our mandate does not extend to interfering with factfinders in state criminal proceedings or with state courts that are responsibly and consistently interpreting state law, unless that interference is predicated on a violation of the Constitution. No convincing showing of such a violation is made here, for, as Mr. Justice Stewart has written in another place, the issue here is not what *our* verdict would have been, but whether "any rational factfinder" could have found the existence of aggravating circumstance § (b)(7). *Jackson* v. *Virginia*, 443 U. S. 307, 313 (1979). Faithful adherence to this standard of review compels our affirmance of the judgment below.[3]

---

[3] The plurality opinion notes that the prosecutor informed the jury that the case involved no torture or aggravated battery and suggests that this fact somehow undermines the belief that a properly complete understanding of § (b)(7) was applied in this case. *Ante*, at 426, 432. But as I observe in text, the trial court judge instructed the jurors to consider § (b)(7) in its entirety and thus did not impose a similarly circumscribed

## V

Under the present statutory regime, adopted in response to *Furman,* the Georgia Supreme Court has responsibly and consistently performed its review function pursuant to the Georgia capital-sentencing procedures. The State reports that, at the time its brief was written, the Georgia Supreme Court had reviewed some 99 cases in which the death penalty has been imposed. Of these, 66 had been affirmed; 5 had been reversed for errors in the guilt phase; and 22 had been

---

view of the case on the jurors. At any event, the prosecutor did argue to the jury that there was depravity of mind. App. 76.

The plurality also notes that in the sentencing report filled out by the trial judge, he wrote that the victims here had not been physically harmed or tortured beyond the fact of their murders. But any argument supportive of the plurality's position based on the judge's sentencing report is undermined by the plurality opinion itself. For that opinion makes clear that the Georgia Supreme Court, in the course of exercising its review function, has developed "criteria" to guide its application of § (b)(7), criteria of which this Court's plurality apparently approves. *Ante,* at 431–432. Surely a court capable of developing such criteria is also capable of keeping them in mind when deciding the latest case to involve the statutory provision that gave birth to the criteria in the first place. Yet the plurality does not recognize the seemingly inescapable conclusion that the Georgia Supreme Court, when affirming petitioner's convictions and sentences, matched the facts of this case to its understanding of the statute and, irrespective of the trial judge's comments, concluded that § (b)(7) properly formed the basis for the imposition of the death penalty. The plurality instead seems to adopt the curious notion that a trial judge is capable of binding an appellate court in the performance of its statutory duty to review trial court determinations.

The plurality opinion also is troubled by the fact that the trial judge gave no guidance to the jurors by way, presumably, of defining the terms in § (b)(7). *Ante,* at 429. Yet the opinion does not demonstrate that such definitions were provided in cases in which the plurality would agree that § (b)(7) was properly applied. Nor does the opinion demonstrate that such definitions obtain a constitutional significance apart from an independent showing—absent here—that juries and courts cannot rationally apply an unequivocal legislative mandate.

reversed for errors in the sentencing phase.[4] Brief for Respondent 13–14. This reversal rate of over 27% is not substantially lower than the historic reversal rate of state supreme courts. See Courting Reversal: The Supervisory Role of State Supreme Courts, 87 Yale L. J. 1191, 1198, 1209 (1978), where it is indicated that 16 state supreme courts over a 100-year period, in deciding 5,133 cases, had a reversal rate of 38.5%; for criminal cases, the reversal rate was 35.6%. To the extent that the reversal rate is lower than the historic level, it doubtless can be attributed to the great and admirable extent to which discretion and uncertainty have been removed from Georgia's capital-sentencing procedures since our decision in *Furman* and to the fact that review is mandatory. See 87 Yale L. J., at 1200–1201.

The Georgia Supreme Court has vacated a death sentence where it believed that the statutory sentencing procedures, as passed by the legislature, were defective, *Gregg* v. *State,* 233 Ga. 117, 210 S. E. 2d 659 (1974) (holding, *inter alia,* that the death penalty for armed robbery was impermissible), aff'd on other grounds, 428 U. S. 153 (1976); it has held that jurors must be instructed that they can impose a life sentence even though they find the existence of a statutory aggravating circumstance, *Fleming* v. *State,* 240 Ga. 142, 240 S. E. 2d 37 (1977); it has reversed the imposition of the death penalty

---

[4] This Court has reversed six of the cases owing to errors of law rising to constitutional significance. *Green* v. *Georgia,* 442 U. S. 95 (1979) (relevant evidence was improperly excluded from the sentencing hearing); *Presnell* v. *Georgia,* 439 U. S. 14 (1978) (Georgia Supreme Court erred by affirming a death sentence for murder based on an underlying rape charge of which the defendant was not properly tried and convicted); *Coker* v. *Georgia,* 433 U. S. 584 (1977) (under the Eighth and Fourteenth Amendments, death is an excessive penalty for a rapist who does not also commit murder); *Eberheart* v. *Georgia,* 433 U. S. 917 (1977) (same as *Coker*); *Hooks* v. *Georgia,* 433 U. S. 917 (1977) (same as *Coker*); *Davis* v. *Georgia,* 429 U. S. 122 (1976) (a prospective juror was excluded from jury service in violation of *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968)).

where the prosecutor made an improper comment during his argument to the jury in the sentencing phase, *Prevatte* v. *State*, 233 Ga. 929, 214 S. E. 2d 365 (1975); *Jordan* v. *State*, 233 Ga. 929, 214 S. E. 2d 365 (1975); it has reversed a trial court's decision limiting the type of mitigating evidence that could be presented, *Brown* v. *State*, 235 Ga. 644, 220 S. E. 2d 922 (1975); it has set aside a death sentence when jurors failed to specify which aggravating circumstances they found to exist, *Sprouse* v. *State*, 242 Ga. 831, 252 S. E. 2d 173 (1979); it has reversed a death sentence imposed on a partial finding of an aggravating circumstance, *Holton* v. *State*, 243 Ga. 312, 253 S. E. 2d 736, cert. denied, 444 U. S. 925 (1979); it has disapproved a death penalty because of errors in admitting evidence, *Stack* v. *State*, 234 Ga. 19, 214 S. E. 2d 514 (1975); it has reversed a capital sentence where a codefendant received only a life sentence, *Hall* v. *State*, 241 Ga. 252, 244 S. E. 2d 833 (1978); and it has held a statutory aggravating circumstance to be unconstitutional, *Arnold* v. *State*, 236 Ga. 534, 224 S. E. 2d 386 (1976).

The Georgia Supreme Court has also been responsible and consistent in its construction of § (b)(7). The provision has been the exclusive or nonexclusive basis for imposition of the death penalty in over 30 cases. In one excursus on the provision's language, the court in effect held that the section is to be read as a whole, construing "depravity of mind," "torture," and "aggravated battery" to flesh out the meaning of "vile," "horrible," and "inhuman." *Harris* v. *State*, 237 Ga. 718, 230 S. E. 2d 1 (1976), cert. denied, 431 U. S. 933 (1977). I see no constitutional error resulting from this understanding of the provision. Indeed, the Georgia Supreme Court has expressly rejected an analysis that would apply the provision disjunctively, *Holton* v. *State, supra,* an analysis that, if adopted, would arguably be assailable on constitutional grounds. And the court has noted that it would apply the

provision only in "core" cases and would not permit § (b)(7) to become a "catchall." *Harris* v. *State, supra.*[5]

Nor do the facts of this case stand out as an aberration. A jury found § (b)(7) satisfied, for example, when a child was senselessly and ruthlessly executed by a murderer who, like petitioner, accomplished this end with a shotgun. The Georgia Supreme Court affirmed. *Ruffin* v. *State,* 243 Ga. 95, 252 S. E. 2d 472, cert. denied, 444 U. S. 995 (1979). See *Banks* v. *State,* 237 Ga. 325, 227 S. E. 2d 380 (1976), cert. denied, 430 U. S. 975 (1977). The court has also affirmed a jury's finding of statutory aggravating circumstance § (b)(7) where,

---

[5] The cases in which a jury has found the existence of § (b)(7) as the sole basis for imposition of the death penalty include *Spraggins* v. *State,* 243 Ga. 73, 252 S. E. 2d 620 (1979) (affirming death sentence for a murder involving multiple stab wounds and partial disembowelment), cert. pending, No. 79-5032; *Holton* v. *State,* 243 Ga. 312, 253 S. E. 2d 736 (reversing death sentence because the jury's finding stated only "depravity of mind"), cert. denied, 444 U. S. 925 (1979); *Godfrey* v. *State,* 243 Ga. 302, 253 S. E. 2d 710 (1979) (case below) (affirming death penalty for shotgun shooting resulting in mutilation); *Johnson* v. *State,* 242 Ga. 649, 250 S. E. 2d 394 (1978) (affirming death sentence for rape and shooting of two women); *Morgan* v. *State,* 241 Ga. 485, 246 S. E. 2d 198 (1978) (affirming death sentence for shotgun shooting of blindfolded victim begging for his life), cert. denied, 441 U. S. 967 (1979); *Ward* v. *State,* 239 Ga. 205, 236 S. E. 2d 365 (1977) (reversing death sentence for stabbing murders because a previous trial had ended in a life sentence; thus death penalty here would be disproportionate); *Blake* v. *State,* 239 Ga. 292, 236 S. E. 2d 637 (affirming death sentence for murder of a child effected by her being thrown off a bridge), cert. denied, 434 U. S. 960 (1977); *Dix* v. *State,* 238 Ga. 209, 232 S. E. 2d 47 (1977) (affirming death sentence for murder accomplished by beating, strangling, and stabbing the victim); *Harris* v. *State,* 237 Ga. 718, 230 S. E. 2d 1 (1976) (affirming death sentence for shooting murder of victim who was forced to beg for her life), cert. denied, 431 U. S. 933 (1977); *Banks* v. *State,* 237 Ga. 325, 227 S. E. 2d 380 (1976) (affirming death sentence for shotgun murder of two victims), cert. denied, 430 U. S. 975 (1977); *Hooks* v. *State,* 233 Ga. 149, 210 S. E. 2d 668 (1974) (affirming death sentence solely for rape), sentence vacated, 433 U. S. 917 (1977).

as here, there was substantial disfigurement of the victim, *McCorquodale* v. *State,* 233 Ga. 369, 211 S. E. 2d 577 (1974), cert. denied, 428 U. S. 910 (1976), and where, as arguably with Mrs. Wilkerson, there was torture of the victim, *ibid.; Birt* v. *State,* 236 Ga. 815, 225 S. E. 2d 248, cert. denied, 429 U. S. 1029 (1976).

The majority's attempt to drive a wedge between this case and others in which § (b)(7) has been applied is thus unconvincing, as is any suggestion that the Georgia Supreme Court has somehow failed overall in performance of its review function.[6]

## VI

In the circumstances of this case, the majority today endorses the argument that I thought we had rejected in *Gregg:* namely, "that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it." 428 U. S., at 226 (opinion of WHITE, J.). The Georgia Supreme Court, faced with a seemingly endless train of macabre scenes, has endeavored in a responsible, rational, and consistent fashion to effectuate its statutory mandate as illuminated by our judgment in *Gregg.* Today, a majority of this Court, its arguments shredded by its own illogic, informs the Georgia Supreme Court that, to some extent, its efforts have been outside the Constitution. I reject this as an unwarranted invasion into the realm of state law, for, as in

---

[6] The plurality opinion states that there is no indication that petitioner's mind was any more depraved than that of any other murderer. *Ante,* at 433. The Court thus assumes the role of a finely tuned calibrator of depravity, demarcating for a watching world the various gradations of dementia that lead men and women to kill their neighbors. I should have thought that, in light of our other duties, such a function would better be performed by the state court statutorily charged with the mission. And unless this Court is willing to supplant the Georgia Supreme Court in the statutory scheme, it would be well advised to reconsider its position.

*Gregg,* "I decline to interfere with the manner in which Georgia has chosen to enforce [its] laws" until a genuine error of constitutional magnitude surfaces. *Ibid.* (opinion of WHITE, J.).

I would affirm the judgment of the Supreme Court of Georgia.