HARTZ, Circuit Judge.
 

 James Pavatt was convicted by an Oklahoma jury of first-degree murder and conspiracy to commit first-degree murder. He was sentenced in accordance with the jury's recommendations to death on the first-degree-murder conviction and ten years' imprisonment on the conspiracy conviction. After exhausting his state-court remedies, he filed an application for relief under
 
 28 U.S.C. § 2254
 
 . The district court denied the application, and also denied a certificate of appealability (COA).
 
 See
 

 28 U.S.C. § 2253
 
 (c)(1) (requiring COA to appeal denial of relief under § 2254 ). Mr. Pavatt sought from this court and was granted a COA on several issues. Exercising jurisdiction under
 
 28 U.S.C. § 1291
 
 , we affirm the district court's denial of relief with respect to his conviction, but we reverse the denial of relief with respect to his sentence and remand to the district court for further proceedings.
 

 I. FACTUAL BACKGROUND
 

 The Oklahoma Court of Criminal Appeals (OCCA) summarized the crime:
 

 [Pavatt] and his co-defendant, Brenda Andrew, were each charged with conspiracy and first-degree capital murder following the shooting death of Brenda's husband, Robert ("Rob") Andrew, at the Andrews' Oklahoma City home on November 20, 2001. [Pavatt] met the Andrews while attending the same church, and [Pavatt] and Brenda taught a Sunday school class together. [Pavatt] socialized with the Andrews and their two young children in mid-2001, but eventually began having a sexual relationship with Brenda. Around the same time, [Pavatt], a life insurance agent, assisted Rob Andrew in setting up a life insurance policy worth approximately $800,000. [Pavatt] divorced his wife in the summer of 2001. In late September, Rob Andrew moved out of the family home, and Brenda Andrew initiated divorce proceedings a short time later.
 

 Janna Larson, [Pavatt's] adult daughter, testified that in late October 2001, [Pavatt] told her that Brenda had asked him to murder Rob Andrew. On the night of October 25-26, 2001, someone severed the brake lines on Rob Andrew's automobile. The next morning, [Pavatt] and Brenda Andrew concocted a false "emergency," apparently in hopes that Rob would have a traffic accident in the process. [Pavatt] persuaded his daughter to call Rob Andrew from an untraceable phone and claim that Brenda was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. The plan failed; Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police.
 

 One contentious issue in the Andrews' divorce was control over the insurance policy on Rob Andrew's life. After his brake lines were severed, Rob Andrew inquired about removing Brenda as beneficiary of his life insurance policy. However, [Pavatt], who had set up the policy, learned of Rob's intentions and told Rob (falsely) that he had no control over the policy because Brenda was the owner. Rob Andrew spoke with [Pavatt's] supervisor, who assured him that he was still the record owner of the policy. Rob Andrew then related his suspicions about [Pavatt] and Brenda to the supervisor. When [Pavatt] learned of this, he became very angry and threatened to harm Rob for putting his job in jeopardy. At trial, the State presented evidence that in the months preceding the murder, [Pavatt] and Brenda actually attempted to transfer ownership of the insurance policy to Brenda without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.
 

 On the evening of November 20, 2001, Rob Andrew drove to the family home to pick up his children for a scheduled visitation over the Thanksgiving holiday. He spoke with a friend on his cell phone as he waited in his car for Brenda to open the garage door. When she did, Rob ended the call and went inside to get his children. A short time later, neighbors heard gunshots. Brenda Andrew called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. Brenda Andrew had also suffered a superficial gunshot wound to her arm. The Andrew children were not, in fact, packed and ready to leave when Rob Andrew arrived
 
 [
 

 1
 

 ]
 
 ; they were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.
 

 Brenda was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down. One witness saw Brenda chatting giddily with [Pavatt] at the hospital later that night.
 

 Rob Andrew was shot twice with a shotgun. A spent shotgun shell found in the garage fit a 16-gauge shotgun, which is a rather unusual gauge. Andrew owned a 16-gauge shotgun, but had told several friends that Brenda refused to let him take it from the home when they separated. Rob Andrew's shotgun was missing from the home when police searched it. One witness testified to seeing Brenda Andrew engaging in target practice at her family's rural Garfield County home about a week before the murder. Several 16-gauge shotgun shells were found at the site.
 

 Brenda told police that her husband was attacked in the garage by two armed, masked men, dressed in black, but gave few other details. Brenda's superficial wound was caused by a .22-caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance as she ran from the garage into the house. About a week before the murder, [Pavatt] purchased a .22-caliber handgun from a local gun shop. On the day of the murder, [Pavatt] borrowed his daughter's car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but his daughter found a .22-caliber bullet on the floorboard. In a conversation later that day, [Pavatt] told Larson never to repeat that Brenda had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the bullet she had found in her car.
 

 Police also searched the home of Dean Gigstad, the Andrews' next-door neighbor. There they found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16-gauge shotgun shell was found on the bedroom floor, and several .22-caliber bullets were found in the attic itself. There were no signs of forced entry into the Gigstads' home. Gigstad and his wife were out of town when the murder took place, but Brenda Andrew had a key to their home. The .22-caliber bullet found in Janna Larson's car was of the same brand as the three .22-caliber bullets found in the Gigstads' attic; the .22-caliber bullet fired at Brenda and retrieved from the Andrews' garage appeared consistent with them in several respects. These bullets were capable of being fired from the firearm that [Pavatt] purchased a few weeks before the murder; further testing was not possible because that gun was never found. The shotgun shell found in the Gigstads' home was of the same brand and odd gauge as the 16-gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16-gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun also turned up missing.
 

 In the days following the murder, [Pavatt] registered his daughter as a signatory on his checking account, and asked her to move his belongings out of his apartment. He obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, Brenda and [Pavatt] asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for the Andrew children to travel with Brenda out of the country.
 

 Brenda also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson could wire them money after they left town. Brenda Andrew did not attend her husband's funeral. Instead, she and [Pavatt] drove to Mexico, and took the Andrew children with them. [Pavatt] called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down [Pavatt] and Brenda. In late February 2002, having run out of money, [Pavatt] and Brenda Andrew re-entered the United States at the Mexican border. They were promptly placed under arrest.
 

 Pavatt v. State
 
 (
 
 Pavatt I
 
 ),
 
 159 P.3d 272
 
 , 276-78 (Okla. Crim. App. 2007) (paragraph numbers and footnotes omitted).
 

 On November 29, 2001, nine days after the murder, an information was filed in state court charging Mr. Pavatt and Brenda Andrew with first-degree murder. An amended information was filed on July 19, 2002, charging them with one count of first-degree murder and one count of conspiracy to commit first-degree murder. The prosecution also filed a bill of particulars alleging three aggravating circumstances for Mr. Pavatt: (1) that he committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration (the remuneration aggravator); (2) that the murder was especially heinous, atrocious, or cruel (the HAC aggravator); and (3) that he constituted a continuing threat to society.
 

 Mr. Pavatt was tried separately from Ms. Andrew (who was also convicted on both counts and sentenced to death). His trial, which began on August 25, 2003, included a guilt phase followed by a sentencing phase. The jury found him guilty on both counts and found the remuneration and HAC aggravators. It also found that these aggravating circumstances outweighed the mitigating circumstances, and it recommended that Mr. Pavatt be sentenced to death on the first-degree-murder conviction.
 

 Mr. Pavatt filed a direct appeal asserting 18 propositions of error. On May 8, 2007, the OCCA rejected Mr. Pavatt's arguments and affirmed his convictions and sentences.
 
 See
 

 Pavatt I
 
 ,
 
 159 P.3d at 297
 
 . Mr. Pavatt's petition for rehearing was denied by the OCCA on June 26, and the United States Supreme Court denied his petition for a writ of certiorari on February 19, 2008.
 
 See
 

 Pavatt v. Oklahoma
 
 ,
 
 552 U.S. 1181
 
 ,
 
 128 S.Ct. 1229
 
 ,
 
 170 L.Ed.2d 62
 
 (2008).
 

 On April 17, 2006, while his direct appeal was pending, Mr. Pavatt filed with the OCCA an application for postconviction relief asserting three propositions of error (one of which, ineffective assistance of appellate and trial counsel, included 23 subpropositions). On April 11, 2008, the OCCA issued an unpublished opinion denying the application.
 
 See
 

 Pavatt v. State
 
 (
 
 Pavatt II
 
 ), No. PCD-2004-25 (Okla. Crim. App. Apr. 11, 2008).
 

 Mr. Pavatt initiated his § 2254 proceedings on May 5, 2008, by filing a motion for appointment of counsel, which the district court granted. On April 1, 2009, his counsel filed a § 2254 application asserting 15 grounds for relief. The application conceded that some of the claims were "newly developed" and "m[ight] require further exhaustion." R. Vol. 3 at 335. For that reason, Mr. Pavatt requested that his application "be held in abeyance so that he [could] return to state court to accomplish any necessary exhaustion."
 

 Id.
 

 But the district court declined to stay the case or otherwise hold it in abeyance. Briefing in the case was completed on October 14,
 2009, when Mr. Pavatt filed a reply brief in support of his application.
 

 Meanwhile, on September 2, 2009, Mr. Pavatt filed with the OCCA a second application for postconviction relief asserting six propositions of error. On February 2, 2010, the OCCA issued an unpublished opinion denying the application.
 
 See
 

 Pavatt v. State
 
 (
 
 Pavatt III
 
 ), No. PCD-2009-777 (Okla. Crim. App. Feb. 2, 2010).
 

 On May 1, 2014, the federal district court issued an order denying Mr. Pavatt's § 2254 application, entered final judgment in the case, and issued an order denying a COA with respect to all issues raised in the application.
 

 Mr. Pavatt filed a notice of appeal on June 2, 2014. In a case-management order issued on November 24, 2014, we granted Mr. Pavatt a COA on the following issues:
 

 A. [1] Whether there was sufficient evidence to support the "especially heinous, atrocious, or cruel" aggravator ... and [2] whether the trial court's failure to provide an adequate instruction to the jury that it must find "conscious physical suffering" beyond a reasonable doubt before finding that the murder was "especially heinous, atrocious, or cruel" violated Mr. Pavatt's constitutional rights to a fair trial, a reliable sentencing determination, and due process ...
 

 B. Whether there was constitutionally ineffective assistance of trial counsel regarding the investigation of mitigating evidence or the presentation of a meaningful case for life imprisonment ... [,] and whether appellate counsel was constitutionally ineffective in failing to raise a claim that trial counsel was ineffective in these regards; and
 

 C. Whether trial counsel provided constitutionally ineffective assistance of counsel regarding the introduction of a camping video, live photographs of the victim, or testimony regarding the victim's good traits ... and whether appellate counsel was constitutionally ineffective in failing to raise a claim that trial counsel was ineffective in these regards.
 

 (Case Management Order, Nov. 24, 2014). Because we reverse on issue A[1], we need not address issues A[2] and B. We affirm on issue C.
 

 II. STANDARD OF REVIEW
 

 In a challenge to a state-court conviction under § 2254, "the appropriate standard of review depends upon whether a claim was decided on the merits in state court."
 
 Stouffer v. Trammell
 
 ,
 
 738 F.3d 1205
 
 , 1213 (10th Cir. 2013) (citation omitted). When, as here, the claims we must resolve on the merits were addressed on the merits, our standard of review is governed by
 
 28 U.S.C. § 2254
 
 (d), which provides:
 

 An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
 

 (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
 

 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
 

 28 U.S.C. § 2254
 
 (d).
 

 "[A] state-court decision is contrary to [Supreme Court] precedent if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or "if the state court confronts facts that are materially indistinguishable
 from a relevant Supreme Court precedent and arrives at a result opposite to the [Supreme Court's]."
 
 Williams v. Taylor
 
 ,
 
 529 U.S. 362
 
 , 405,
 
 120 S.Ct. 1495
 
 ,
 
 146 L.Ed.2d 389
 
 (2000). "On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1) 's 'contrary to' clause."
 

 Id.
 

 at 406
 
 ,
 
 120 S.Ct. 1495
 
 .
 

 As for the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has said, "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision involving an unreasonable application of clearly established Federal law."
 

 Id.
 

 at 407-08
 
 ,
 
 120 S.Ct. 1495
 
 (brackets and ellipsis omitted) (internal quotation marks omitted). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."
 

 Id.
 

 at 409
 
 ,
 
 120 S.Ct. 1495
 
 . Notably, "an
 
 unreasonable
 
 application of federal law is different from an
 
 incorrect
 
 application of federal law."
 

 Id.
 

 at 410
 
 ,
 
 120 S.Ct. 1495
 
 . Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."
 

 Id.
 

 at 411
 
 ,
 
 120 S.Ct. 1495
 
 .
 

 III. PAVATT'S CHALLENGES TO VERDICT OF GUILTY
 

 Mr. Pavatt's sole challenge to his conviction is that his trial counsel was ineffective in failing to object to the admission of three categories of evidence allegedly designed to evoke sympathy for the victim, Rob Andrew: (1) a videotape showing Mr. Pavatt and Mr. Andrew on a hunting trip, (2) "glowing accounts" of Mr. Andrew from his friends and family, and (3) four photographs of him taken before his death. Aplt. Br. at 49. The first two claims are procedurally barred, and the third lacks merit.
 

 The claim of inadequate assistance with respect to the first two categories of evidence was not adequately raised in federal district court. The only challenge at all related to category 1 in Mr. Pavatt's amended petition under § 2254 was headed: "Counsel Failed to Object to the Admission of Live Photographs of Rob Andrew." App., Vol. 3 at 317. But that section of the 216-page petition (which served as the brief in support) does not claim ineffective assistance with respect to the video. Indeed, it begins with the sentence, "Trial counsel objected to the admission of the video recording of the hunting trip."
 

 Id.
 

 In this court Mr. Pavatt argues that the trial objection to the video was inadequate; but that claim was not made below.
 

 As for category 2, one sentence in the "Live Photographs" section of the petition states, "A review of his conduct further reveals that trial counsel allowed multiple witnesses, who were friends and family of Rob Andrew, to testify to entirely irrelevant matters that could only raise sympathy in the minds of jurors.
 
 See
 
 Grounds 2, 7,
 
 infra
 
 ."
 
 Id.
 
 at 318.
 
 [2]
 
 But this one sentence, which is not developed further, and which is buried in a section whose heading
 does not encompass the point, does not adequately preserve this ineffectiveness issue. The district court, not perceiving it as an issue, did not address it in the 112-page opinion denying relief.
 

 Thus, the only ineffectiveness claim relating to the guilt phase of the trial that was preserved in federal district court is that trial counsel did not adequately object to the admission of the photographs (and that appellate counsel did not raise on appeal this deficiency of trial counsel). Mr. Pavatt has not argued that admission of this evidence during the guilt phase violated any federal constitutional right. The alleged ineffectiveness was only counsel's failure to argue that the evidence should have been excluded under Oklahoma law. This ineffectiveness challenge clearly fails with respect to one of the pictures (State's Exhibit 219). In his first state postconviction petition, Mr. Pavatt argued that his trial and appellate counsel should have objected to the admission of the exhibit. But the OCCA rejected the argument, holding that the claim was barred by res judicata and noting that it had sustained the admissibility of a similar photograph in a prior case.
 
 See
 

 Pavatt II,
 
 No. PCD-2004-25 at 6 n.6. A claim of ineffective assistance of counsel for failure to object to evidence cannot be sustained if the objection was doomed to fail.
 
 See
 

 Williams v. Trammell,
 

 782 F.3d 1184
 
 , 1198 (10th Cir. 2015).
 

 That leaves only a challenge to the failure to object to three other photographs taken of Mr. Andrew during his life. But even if competent counsel should have objected to the evidence, Mr. Pavatt's ineffectiveness claim fails for lack of prejudice. To prevail on such a claim, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [guilt phase] would have been different."
 

 Id.
 

 at 1197-98
 
 (internal quotation marks omitted). We are at a total loss to see how, in light of the compelling evidence of guilt, the three photographs could have been a significant factor in the verdict; and Mr. Pavatt offers no argument in support. We therefore reject this portion of the claim on the merits.
 

 IV. "HEINOUS, ATROCIOUS, OR CRUEL" (HAC) AGGRAVATOR
 

 At the conclusion of the second-stage proceedings the jury found the murder to be "especially heinous, atrocious, or cruel."
 
 [3]
 
 The jury instruction on the HAC aggravating circumstance defined the terms as follows:
 

 As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
 

 The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.
 

 R. Vol. 1 at 188. According to Mr. Pavatt, the evidence presented at his trial was "constitutionally insufficient" to establish the HAC aggravator, Aplt. Br. at 21, and the OCCA's determination to the contrary was "contrary to or an unreasonable application of Supreme Court law,"
 
 id
 
 . at 36.
 

 "To assess the sufficiency of the evidence, we first determine the elements of the offense and then examine
 whether the evidence suffices to establish each element."
 
 Anderson-Bey v. Zavaras
 
 ,
 
 641 F.3d 445
 
 , 448 (10th Cir. 2011). Due process requires that the evidence presented at trial, viewed in the light most favorable to the prosecution, be sufficient to allow a "rational trier of fact [to] have found the essential elements of the crime beyond a reasonable doubt."
 
 Jackson v. Virginia
 
 ,
 
 443 U.S. 307
 
 , 319,
 
 99 S.Ct. 2781
 
 ,
 
 61 L.Ed.2d 560
 
 (1979). In a capital case the aggravating factors necessary for imposition of the death penalty "operate as the functional equivalent of an element of a greater offense."
 
 Ring v. Arizona
 
 ,
 
 536 U.S. 584
 
 , 609,
 
 122 S.Ct. 2428
 
 ,
 
 153 L.Ed.2d 556
 
 (2002) (internal quotation marks omitted).
 

 The elements of a state offense are ordinarily purely a matter of state law. In reviewing a state conviction under § 2254, we do not second guess whether the state courts have correctly interpreted their law.
 
 See
 

 Estelle v. McGuire
 
 ,
 
 502 U.S. 62
 
 , 67-68,
 
 112 S.Ct. 475
 
 ,
 
 116 L.Ed.2d 385
 
 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). But States do not have a totally free hand in deciding how to define their aggravating circumstances for capital cases. The United States Constitution sets some limits. Since the Supreme Court held in
 
 Furman v. Georgia
 
 ,
 
 408 U.S. 238
 
 ,
 
 92 S.Ct. 2726
 
 ,
 
 33 L.Ed.2d 346
 
 (1972), that then-current capital-sentencing procedures were unconstitutional, the underlying principle guiding Supreme Court doctrine has been that "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be ... wantonly and ... freakishly imposed."
 
 Lewis v. Jeffers
 
 ,
 
 497 U.S. 764
 
 , 774,
 
 110 S.Ct. 3092
 
 ,
 
 111 L.Ed.2d 606
 
 (1990) (brackets, ellipsis, and internal quotation marks omitted). To prevent that intolerable result, discretion in imposing the death penalty "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."
 

 Id.
 

 (internal quotation marks omitted). The State must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death."
 

 Id.
 

 (internal quotation marks omitted).
 

 Thus, a defendant challenging the sufficiency of the evidence to support a capital aggravator may, as Mr. Pavatt does here, raise both a
 
 Jackson
 
 challenge to the sufficiency of the evidence to establish the aggravator as defined by state law and an Eighth Amendment challenge to the constitutionality of the aggravator as so defined. Our focus is on the Eighth Amendment challenge. This requires a thorough review of Supreme Court precedent regarding how federal courts are required to examine a State's aggravating circumstances to see if they pass muster.
 

 We start with
 
 Gregg v. Georgia
 
 ,
 
 428 U.S. 153
 
 ,
 
 96 S.Ct. 2909
 
 ,
 
 49 L.Ed.2d 859
 
 (1976), where the Supreme Court considered Georgia's outrageously-or-wantonly-vile aggravator, which included any murder that was " 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim,' "
 

 id.
 

 at 210
 
 ,
 
 96 S.Ct. 2909
 
 (White, J., concurring) (quoting Georgia statute). The prevailing plurality stated that it was "arguable that any murder involves depravity of mind or an aggravated battery."
 

 Id.
 

 at 201
 
 ,
 
 96 S.Ct. 2909
 
 (joint opinion of Justices Stewart, Powell, and Stevens). But, in the view of those Justices, the aggravator's "language need not be construed in this way," and they would not invalidate the aggravator because "there [was] no reason to assume that the Supreme Court of Georgia [would]
 

 adopt such an open-ended construction."
 

 Id.
 

 ;
 
 see
 

 Lewis
 
 ,
 
 497 U.S. at 775
 
 ,
 
 110 S.Ct. 3092
 
 (construing this as the holding in
 
 Gregg
 
 ).
 

 Later, however, in
 
 Godfrey v. Georgia
 
 ,
 
 446 U.S. 420
 
 ,
 
 100 S.Ct. 1759
 
 ,
 
 64 L.Ed.2d 398
 
 (1980), the Court took another look at the State's application of the aggravator. The prevailing plurality (two other Justices would have set aside the death sentence on broader grounds) framed the issue before the court as "whether, in affirming the imposition of the sentences of death in the present case, the Georgia Supreme Court has adopted such a broad and vague construction of the [pertinent] aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the United States Constitution."
 

 Id.
 

 at 423
 
 ,
 
 100 S.Ct. 1759
 
 . Godfrey murdered his wife and mother-in-law after his wife, who had moved in with her mother, had ended a telephone conversation by telling him that reconciliation would be impossible. The Court described the facts of the murder as follows:
 

 At this juncture, the petitioner got out his shotgun and walked with it down the hill from his home to the trailer where his mother-in-law lived. Peering through a window, he observed his wife, his mother-in-law, and his 11-year-old daughter playing a card game. He pointed the shotgun at his wife through the window and pulled the trigger. The charge from the gun struck his wife in the forehead and killed her instantly. He proceeded into the trailer, striking and injuring his fleeing daughter with the barrel of the gun. He then fired the gun at his mother-in-law, striking her in the head and killing her instantly.
 

 Id.
 

 at 425
 
 ,
 
 100 S.Ct. 1759
 
 .
 
 [4]
 
 The Georgia Supreme Court rejected Godfrey's challenge to the aggravator as unconstitutionally vague, noting its prior rejection of such challenges and stating that the evidence supported the jury's finding of the aggravating circumstances.
 
 See
 

 id.
 

 at 427
 
 ,
 
 100 S.Ct. 1759
 
 .
 

 The United States Supreme Court reversed. Although it acknowledged that in prior cases the Georgia Supreme Court had applied constitutionally valid narrowing constructions of the aggravator, it said that there was no evidence that the Georgia court had applied a narrowing construction in that case.
 
 See
 

 id.
 

 at 429-32
 
 ,
 
 100 S.Ct. 1759
 
 ;
 
 Lewis
 
 ,
 
 497 U.S. at 775
 
 ,
 
 110 S.Ct. 3092
 
 (paraphrasing
 
 Godfrey
 
 ). In particular, the state court had upheld the death sentence even though, in contrast to prior cases in which the sentence had been upheld, there was no claim of torture and no evidence that the defendant had "committed an aggravated battery upon [either victim] or, in fact, caused either of them to suffer any physical injury preceding their deaths."
 
 446 U.S. at 432
 
 ,
 
 100 S.Ct. 1759
 
 . The prevailing plurality said that there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not."
 
 446 U.S. at 433
 
 ,
 
 100 S.Ct. 1759
 
 ;
 
 see also
 

 id.
 

 at 428-29
 
 ,
 
 100 S.Ct. 1759
 
 ("a person
 of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' ")
 

 The Supreme Court's standard was succinctly stated in
 
 Zant v. Stephens
 
 ,
 
 462 U.S. 862
 
 , 877,
 
 103 S.Ct. 2733
 
 ,
 
 77 L.Ed.2d 235
 
 (1983) : "[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder";
 
 see also
 

 Lewis
 
 ,
 
 497 U.S. at 776
 
 ,
 
 110 S.Ct. 3092
 
 ("aggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not"). The Court held that the two aggravating circumstances in that case (the defendant had escaped from lawful confinement and had a prior conviction for a capital felony) "adequately differentiate this case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed."
 
 462 U.S. at 879
 
 ,
 
 103 S.Ct. 2733
 
 .
 

 Of particular significance to this appeal is
 
 Maynard v. Cartwright
 
 ,
 
 486 U.S. 356
 
 , 359,
 
 108 S.Ct. 1853
 
 ,
 
 100 L.Ed.2d 372
 
 (1988), affirming
 
 Cartwright v. Maynard
 
 ,
 
 822 F.2d 1477
 
 (10th Cir. 1987) (en banc), which considered Oklahoma's HAC aggravator. The operative language of the aggravator was the same as for this case-"especially heinous, atrocious, or cruel." And the jury had been instructed that " 'the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.' "
 
 Cartwright
 
 ,
 
 822 F.2d at 1488
 
 . The Supreme Court said that in applying the aggravator, the OCCA "simply had reviewed all the circumstances of the murder and decided whether the facts made out the aggravating circumstance."
 
 486 U.S. at 360
 
 ,
 
 108 S.Ct. 1853
 
 . It held that the OCCA's approach did not satisfy the Eighth Amendment (1) because the statutory language "fail[ed] adequately to inform juries what they must find to impose the death penalty and as a result [left] them and appellate courts with the kind of open-ended discretion which [had been] held invalid in [
 
 Furman
 
 ],"
 
 486 U.S. at 361-62
 
 ,
 
 108 S.Ct. 1853
 
 , and (2) because the OCCA had not construed the HAC aggravator in a manner sufficient "to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment,"
 

 id.
 

 at 364
 
 ,
 
 108 S.Ct. 1853
 
 . "Court precedents," it said, "have insisted that the channeling and limiting of the sentencer's discretion in imposing the death sentence is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action."
 

 Id.
 

 at 362
 
 ,
 
 108 S.Ct. 1853
 
 . The Court compared the language of the Oklahoma aggravator to the "outrageously or wantonly vile, horrible and inhuman" language considered in
 
 Godfrey
 
 , where the Court had said: "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' "
 

 Id.
 

 at 363
 
 ,
 
 108 S.Ct. 1853
 
 (internal quotation marks omitted). The vague language of the aggravator resulted in there being "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not."
 

 Id.
 

 (internal quotation marks omitted). The Court further rejected "[t]he State's contention that the addition
 of the word 'especially' somehow guides the jury's discretion, even if the term 'heinous' does not."
 

 Id.
 

 at 364
 
 ,
 
 108 S.Ct. 1853
 
 . The contention was "untenable" because "[t]o say that something is 'especially heinous' merely suggests that the individual jurors should determine that the murder is more than just 'heinous,' whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.' "
 

 Id.
 

 The Court indicated, however, that Oklahoma could cure the problem by providing a limiting construction of the statutory language. It mentioned that this court had noted cases stating that imposing a requirement of torture or serious physical abuse is adequate but the Court left open the possibility that other limiting instructions could also suffice.
 
 See
 

 id.
 

 at 364-65
 
 ,
 
 108 S.Ct. 1853
 
 .
 

 In response to this court's
 
 Cartwright
 
 opinion, the OCCA narrowed its construction of the HAC aggravator. It required that "the murder of the victim [be] preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty."
 
 Cheney v. State
 
 ,
 
 909 P.2d 74
 
 , 80 (Okla. Crim. App. 1995) ;
 
 see
 

 Medlock v. Ward
 
 ,
 
 200 F.3d 1314
 
 , 1324 (10th Cir. 2000) (Lucero, J., concurring) (summarizing Oklahoma law). "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met."
 
 Cheney
 
 ,
 
 909 P.2d at 80
 
 (internal quotation marks omitted). As for extreme mental cruelty, "torture creating extreme mental distress must be the result of intentional acts by the defendant" and "must produce mental anguish in addition to that which of necessity accompanies the underlying killing."
 
 Id
 
 .
 

 Consequently, the HAC aggravator "contemplates a two-step analysis."
 
 Nuckols v. State
 
 ,
 
 805 P.2d 672
 
 , 674 (Okla. Crim. App. 1991). The first step requires the jury to determine whether the "death of the victim was preceded by torture or serious physical abuse."
 

 Id.
 

 (internal quotation marks omitted). "Once this foundational assessment is made, ... the jury may apply the definitions given to them ... to measure whether or not the crime can be considered to have been heinous, atrocious or cruel."
 

 Id.
 

 This two-step analysis is reflected in the uniform jury instruction set forth in
 
 DeRosa v. State
 
 ,
 
 89 P.3d 1124
 
 (Okla. Crim. App. 2004), decided after Mr. Pavatt's trial. The instruction-to "be used in all future capital murder trials" in which the HAC aggravator is alleged-states:
 

 The State has alleged that the murder was "especially heinous, atrocious, or cruel." This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:
 

 First,
 
 that the murder was preceded by either torture of the victim or serious physical abuse of the victim; and
 

 Second,
 
 that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel.
 

 You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that
 
 you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his/her death
 
 .
 

 In addition, you are instructed that the term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or
 utter indifference to or enjoyment of the suffering of others.
 

 Id.
 

 at 1156
 
 . "This instruction [did] not change any of the legal requirements of the 'heinous, atrocious, or cruel' aggravating circumstance as it ha[d] existed up until [that] time."
 

 Id.
 

 Its purpose was "to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings."
 

 Id.
 

 In short, the OCCA has confined the HAC aggravator, in the absence of extreme mental cruelty, to murders in which "the victim experiences conscious physical suffering" before death. This court has responded favorably. We first approved the
 
 Cheney
 
 narrowing construction in
 
 Hatch v. State of Oklahoma
 
 ,
 
 58 F.3d 1447
 
 , 1468-69 (10th Cir. 1995). In further holding that the trial judge properly applied the enhancement, we quoted the following from the judge's remarks at the sentencing proceeding:
 

 When the law talks of torturing people, that doesn't mean you have to put them on the rack or twist their arms or something. I can't think of anymore [sic] torture than to tie a man and a woman up, hog-tie them where they can't move and at the same time while they're laying there waiting to be shot, they listen to their twelve-year-old daughter crying and pleading not to be raped by two grown men.
 

 Id
 
 . at 1469. We said that the judge "found the necessary facts to indicate that the crime involved torture or physical abuse."
 

 Id.
 

 We repeated our endorsement of the narrowing construction in
 
 Medlock v. Ward,
 

 200 F.3d 1314
 
 , 1321 (10th Cir. 2000), stating: "We have held that the 'heinous, atrocious, or cruel' aggravating circumstance as narrowed by the Oklahoma courts after
 
 Maynard
 
 to require torture or serious physical abuse characterized by conscious suffering can provide a principled narrowing of the class of those eligible for death." And we concluded that the defendant in that case had "fail[ed] to demonstrate that Oklahoma ha[d] applied its narrowing construction in an unconstitutional manner."
 

 Id.
 

 In support of that conclusion, we set forth the following evidence:
 

 [The defendant] repeatedly grabbed his victim by the arm, wrestled with her, struck her in the face, threw her onto his bed, and covered her mouth when she began screaming. He choked her until she temporarily passed out, then dragged her to the toilet and stuck her head into the bowl while she was conscious and gasping for air, keeping her there for ten minutes until she passed out again. When he noticed she was still breathing and alive, he used a steak knife to stab her in the back of the neck and, when that knife bent, took a hunting knife and stabbed her in the back of the neck again until she died.
 

 Id
 
 . at 1322 (citations omitted);
 
 see also
 

 Duvall v. Reynolds
 
 ,
 
 139 F.3d 768
 
 , 792-94 (10th Cir. 1998) (after defendant stabbed the victim more than 25 times on her head, chest, abdomen, and back, the victim asked for help, and he responded, "Well ..., it's just too late for that," before proceeding to suffocate her with a pillow).
 

 But our prior opinions are not an open-ended endorsement of any possible interpretation or application of the narrowing construction. On the contrary, in 2000, although reversing a death penalty based on the HAC aggravator for lack of evidence, we said that "we would be remiss if we failed to note" that Oklahoma's construction of the HAC aggravator in that case "appears to raise serious constitutional questions about whether [the] aggravator
 legitimately narrows the class of those eligible for death."
 
 Thomas v. Gibson
 
 ,
 
 218 F.3d 1213
 
 , 1228 n.17 (10th Cir. 2000). The following year we expressed a more general concern about Oklahoma's construction of the aggravator. We wrote:
 

 Recent Oklahoma cases ... have begun to blur the common understanding of the requisite torture and conscious serious physical suffering, more and more often finding the existence of [the HAC] elements in almost every murder. ... There is certainly a concern that Oklahoma's interpretation of its narrowing language could again render this aggravating factor unconstitutional.
 
 See
 

 Thomas
 
 ,
 
 218 F.3d at
 
 1228 & n. 17 ;
 
 see also
 

 Medlock
 
 ,
 
 200 F.3d at 1324
 
 (Lucero, J., concurring) (noting that if Oklahoma permitted capital sentencers to find the [HAC] aggravator, based merely on the brief period of conscious suffering necessarily present in virtually all murders it would fail to narrow the sentencer's discretion, as constitutionally required [by]
 
 Godfrey
 
 ).
 

 Romano v. Gibson
 
 ,
 
 239 F.3d 1156
 
 , 1176 (10th Cir. 2001) (original brackets and internal quotation marks omitted).
 

 With this background, we turn to the case before us. The State agrees that it had to prove that Mr. Andrew experienced conscious physical suffering. But the supporting evidence is slim. The State points to three items of evidence. First, the testimony of the medical examiner. All he said, however, was that it was
 
 possible
 
 (he did not testify that it was
 
 probable
 
 ) that Mr. Andrew could have been conscious for a time after the shooting; regarding pain, he said only that Mr. Andrew could have experienced pain while dying.
 
 See
 
 Tr. at 2457-67. Second, the conversation between Mrs. Andrew and the 911 operator. While reciting her fabricated account of the murder, Mrs. Andrew, prompted by the operator, said that Mr. Andrew was still breathing and trying to talk to her. (She did not mention any sign of suffering or pain.) Finally, Mr. Andrew's body was found holding a plastic bag of cans, which, in the OCCA's view, "reasonably suggested that he either tried to ward off his attacker or shield himself from being shot."
 
 Pavatt I
 
 ,
 
 159 P.3d at 294
 
 .
 

 Perhaps a reasonable juror could have found this to be sufficient evidence of conscious physical suffering (although we note that the jury was never instructed that it needed to make that finding). But this is not the sort of suffering that could in a "principled way ... distinguish this case, in which the death penalty was imposed, from the many cases in which it was not."
 
 Godfrey
 
 ,
 
 446 U.S. at 433
 
 ,
 
 100 S.Ct. 1759
 
 . To repeat what Judge Lucero stated in his concurrence in
 
 Medlock
 
 ,
 

 Under the Eighth Amendment, applying the narrowing construction of the aggravating circumstance in a manner that permitted Oklahoma courts to find 'torture or serious physical abuse' based merely on the brief period of conscious suffering necessarily present in virtually all murders would fail to narrow the sentencer's discretion as required by [
 
 Godfrey
 
 ] and [
 
 Maynard
 
 ], leaving the sentencer "with the kind of open-ended discretion which was held invalid in [
 
 Furman
 
 ]."
 

 200 F.3d at 1324
 
 (Lucero, J., concurring) (quoting
 
 Maynard
 
 ,
 
 486 U.S. at 361-62
 
 ,
 
 108 S.Ct. 1853
 
 ). Indeed, the OCCA apparently recognized as much in one context, stating that "[t]he torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing."
 
 Cheney
 
 ,
 
 909 P.2d at 80
 
 . For example, in
 
 Cudjo v. State
 
 ,
 
 925 P.2d 895
 
 , 901 (OCCA 1996), the victim "did experience some conscious physical or mental suffering prior to his death," but the court nevertheless held
 that "the evidence fails to demonstrate that his murder was preceded by torture or serious physical abuse."
 

 Thus, we have a case controlled by the Supreme Court's holding in
 
 Godfrey
 
 . The State has an aggravator that at one time it had been construing in a constitutionally acceptable manner. But, as in
 
 Godfrey
 
 , that does not immunize its decisions from review of whether it has departed from that acceptable construction. Mr. Pavatt has challenged "whether there was sufficient evidence to support a constitutional reading and application of the [HAC aggravator]." Reply Br. at 5;
 
 see
 
 Aplt. Br. at 21 ("the evidence here-as related to the core element of conscious suffering-is constitutionally insufficient");
 
 id.
 
 at 35-36 ("The Eighth and Fourteenth Amendments require that an aggravator serve a narrowing function rather than become a standardless catch-all.
 
 Arave v. Creech,
 

 507 U.S. 463
 
 , 474,
 
 113 S.Ct. 1534
 
 ,
 
 123 L.Ed.2d 188
 
 (1993) and
 
 Godfrey
 
 .... Oklahoma has veered off the course forced on it by
 
 Cartwright
 
 , coming full circle and no longer limiting this clearly vague aggravating circumstance in a manner that minimizes 'the risk of wholly arbitrary and capricious action.'
 
 Maynard
 
 ,
 
 486 U.S. at 362-63
 
 ,
 
 108 S.Ct. 1853
 
 ."). We hold that this Eighth Amendment challenge is meritorious.
 
 [5]
 

 Maynard
 
 and other Supreme Court precedents have held that the Oklahoma HAC aggravator would not be constitutional absent a narrowing construction that would distinguish in a principled manner those cases meriting the death penalty under the aggravator from the many cases in which it was not imposed.
 
 See
 

 486 U.S. at 363
 
 ,
 
 108 S.Ct. 1853
 
 . And
 
 Godfrey
 
 established that even when a State has previously applied a constitutionally valid narrowing construction of an aggravator, a death penalty imposed under the aggravator must still be based on a construction that in a "principled way" can distinguish the case from the many in which the penalty was not imposed.
 
 446 U.S. at 433
 
 ,
 
 100 S.Ct. 1759
 
 . This case illustrates that the OCCA no longer construes "conscious physical suffering" so that it distinguishes in a principled way between crimes deserving death and the many cases in which the death penalty is not imposed. Virtually any murder in which the victim did not die instantly could qualify for the enhancement as presently construed if there is a possibility that the act of murder did not immediately render the victim unconscious and the wounds could have caused pain. The State has not offered any reason to believe, or even bothered to argue, that "the brief period of conscious suffering necessarily present in virtually all murders,"
 
 Medlock
 
 ,
 
 200 F.3d at 1324
 
 (Lucero,
 J., concurring), could provide a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not,"
 
 Maynard
 
 ,
 
 486 U.S. at 363
 
 ,
 
 108 S.Ct. 1853
 
 . Even if, though we doubt, many murder victims do not experience even a brief period of conscious physical suffering between the time of the fatal blow and death, that possibility would so often be purely a matter of chance that we think it is not a principled way to determine who should suffer the penalty of death and who should not. (Of course, the murderer's intent to cause such suffering would be another matter altogether.) Thus, the OCCA did not apply a constitutionally acceptable interpretation of Oklahoma's HAC aggravator in determining that the aggravator was supported by sufficient evidence.
 

 An important point requires emphasis. We are not saying that the OCCA in this case unconstitutionally applied a constitutionally acceptable narrowing construction of the State's HAC aggravator. We are saying that it did not apply the narrowing construction that we previously approved. By expanding the meaning of "conscious physical suffering" to encompass "the brief period of conscious suffering necessarily present in virtually all murders,"
 
 Medlock,
 

 200 F.3d at 1324
 
 (Lucero, J., concurring)-as it did in this case-Oklahoma has construed the HAC aggravator in a constitutionally impermissible manner.
 
 Lewis
 
 distinguished
 
 Godfrey
 
 on the ground that "[u]nlike in
 
 Godfrey,
 
 there is no dispute in this case that the Arizona Supreme Court applied its narrowing construction of Arizona's ... aggravating circumstance to the facts of respondent's case."
 
 497 U.S. at 776-77
 
 ,
 
 110 S.Ct. 3092
 
 . In this case, however, there is such a dispute, and it is the heart of the matter. We are unwilling to hold that once we have held that an aggravator has been or could be constitutionally construed, we cannot revisit the issue after it is clear that the state court has not adopted a constitutionally acceptable construction. That is the lesson of
 
 Godfrey,
 
 and
 
 Lewis
 
 did not reject that lesson.
 

 We recognize that our standard of review in this appeal is established by AEDPA. We can grant relief "with respect to [a] claim that was adjudicated on the merits in State court proceedings," only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."
 
 28 U.S.C. § 2254
 
 (d)(1). Here, however, the decision of the OCCA failed to pass muster under this provision. To properly decide whether there was sufficient evidence to sustain the aggravator, the court needed to determine that the evidence would support a finding of
 
 conscious physical suffering
 
 under a definition of that term that satisfied both Oklahoma law and the Eighth Amendment. Although it could certainly determine how
 
 conscious physical suffering
 
 should be defined under Oklahoma law and (we will assume) it properly concluded that the evidence at trial satisfied that definition, it totally failed to consider the other component of the analysis-whether the definition it applied satisfies the Eighth Amendment. As Mr. Pavatt puts it, the OCCA did not address "whether there was sufficient evidence to support a constitutional reading and application of the [HAC] aggravator." Reply Br. at 5.
 

 As we understand recent Supreme Court authority, the OCCA's rejection of Mr. Pavatt's sufficiency-of-the-evidence claim without applying or even considering controlling Supreme Court precedent (or at least engaging in an equivalent analysis even if not citing Supreme Court precedent) rendered its decision contrary to clearly established federal law. In
 
 Lafler v. Cooper
 
 ,
 
 566 U.S. 156
 
 ,
 
 132 S.Ct. 1376
 
 ,
 
 182 L.Ed.2d 398
 
 (2012), the Court reviewed a decision of the Michigan appellate court denying the defendant's ineffective-assistance-of-counsel claim based on counsel's alleged incompetence in advising him to reject a prosecution plea offer. The defendant proceeded to trial and ultimately received a sentence much harsher than what had been offered.
 
 See
 

 id.
 

 at 161
 
 ,
 
 132 S.Ct. 1376
 
 . The Court applied the two-part test for ineffective assistance set forth in
 
 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 ,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 (1984), which requires the defendant to establish deficient performance and prejudice from that deficiency.
 
 See
 

 Lafler
 
 ,
 
 566 U.S. at 162-63
 
 ,
 
 132 S.Ct. 1376
 
 . Because there was no dispute that counsel's performance was deficient, "[t]he question for [the] Court [was] how to apply Strickland's prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial."
 
 Id
 
 . at 163,
 
 132 S.Ct. 1376
 
 . This was a new issue for the Court. It had "never held that a defendant in [that] position can establish
 
 Strickland
 
 prejudice."
 
 Id
 
 . at 183,
 
 132 S.Ct. 1376
 
 (Scalia, J., dissenting);
 
 see
 

 Williams v. Jones
 
 ,
 
 571 F.3d 1086
 
 , 1097-1101 (10th Cir 2009) (Gorsuch, J., dissenting) (arguing, in same circumstances, that defendant suffered no prejudice to a constitutional interest, given that he received a fair trial). But "AEDPA [did] not present a bar to granting [the defendant] relief."
 
 566 U.S. at 173
 
 ,
 
 132 S.Ct. 1376
 
 . The Court explained:
 

 That is because the [state court] identified [the defendant's] ineffective-assistance-of-counsel claim but failed to apply
 
 Strickland
 
 to assess it. Rather than applying
 
 Strickland
 
 , the state court simply found that [the defendant's] rejection of the plea was knowing and voluntary. An inquiry into whether the rejection of a plea is knowing and voluntary, however, is not the correct means by which to address a claim of ineffective assistance of counsel. ...
 
 By failing to apply Strickland to assess the ineffective-assistance-of-counsel claim [the defendant] raised, the state court's adjudication was contrary to clearly established federal law
 
 .
 

 Id
 
 . (citations omitted) (emphasis added).
 

 Likewise, in this case the OCCA's adjudication was "contrary to clearly established federal law" because its analysis did not discuss, apply, or even cite the Supreme Court decisions governing the constitutional requirements limiting death-penalty aggravators. The opinion did not address at all whether the evidence presented was sufficient to support a
 
 constitutionally acceptable
 
 HAC aggravator.
 
 [6]
 
 Therefore, "AEDPA does not present a bar to granting [Mr. Pavatt] relief."
 

 Id.
 

 "[I]n [this] circumstance, the federal courts in this habeas action can determine the principles necessary to grant relief."
 

 Id.
 

 This we have done. Applying Supreme Court precedent, we hold that the HAC aggravator cannot constitutionally be applied in this case.
 

 In following
 
 Lafler
 
 we are not proceeding contrary to
 
 Harrington v. Richter,
 

 562 U.S. 86
 
 ,
 
 131 S.Ct. 770
 
 ,
 
 178 L.Ed.2d 624
 
 (2011). That opinion held that " § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied."
 

 Id.
 

 at 98
 
 ,
 
 131 S.Ct. 770
 
 . It did not say that when the
 state court provides some reasons why a claim for relief has been denied, we should presume that it also had additional, more persuasive, reasons. The author of
 
 Lafler,
 
 who had written the Court's opinion in
 
 Richter
 
 a year earlier, did not speculate that the lower court had silently applied
 
 Strickland
 
 in denying relief. And there was much stronger reason to assume that the lower court in
 
 Lafler
 
 had silently applied
 
 Strickland
 
 than there is to believe that the OCCA in this case considered Eighth Amendment constraints on its construction of the HAC aggravator. As the dissent in
 
 Lafler
 
 pointed out, the state court in that case had recited the requirements of
 
 Strickland
 
 in the paragraph preceding the one relied on by the majority in concluding that the state court had not
 
 applied
 
 those requirements.
 
 Lafler
 
 ,
 
 566 U.S. at 182-83
 
 ,
 
 132 S.Ct. 1376
 
 (Scalia, J., dissenting). In our case, the OCCA resolved Mr. Pavatt's sufficiency-of-the-evidence issue without any mention of the Eighth Amendment or its principles.
 

 V. CONCLUSION
 

 We
 
 AFFIRM
 
 the judgment of the district court regarding Mr. Pavatt's conviction but
 
 REVERSE
 
 and
 
 REMAND
 
 with respect to his sentence. We
 
 DENY
 
 Mr. Pavatt's request for an additional COA.
 

 In its opinion reviewing the conviction of Brenda Andrews, the OCCA corrected this statement. There was not evidence that the bags were not packed.
 
 See
 
 Order Denying Appellant's Motion for Rehearing, But Ordering That The Opinion Be Corrected (Okla. Crim. App. Sept. 11, 2017, at 3)
 

 Ground 2 of the petition is a Confrontation Clause challenge to alleged hearsay introduced at trial; the word
 
 sympathy
 
 does not appear in the petition's discussion of that ground. Ground 7 addresses alleged prosecutorial misconduct. The petition contains a section under that ground entitled "First Stage Victim Sympathy," but it does not say anything about what, if any, sympathy evidence was objected to by trial counsel.
 

 Id.
 

 at 224
 
 .
 

 The jury also found the remuneration aggravator. The parties have not presented arguments on what effect that has on the disposition of this case. We leave the matter to the district court on remand.
 

 Justice White's dissent also described Godfrey's murder of his mother-in-law: "[After Godfrey killed his wife with a shotgun blast that left a hole in her head the size of a silver dollar,] he took out time not only to strike his daughter on the head, but also to reload his single-shot shotgun and to enter the house. Only then did he get around to shooting his mother-in-law, ... whose last several moments as a sentient being must have been as terrifying as the human mind can imagine."
 
 446 U.S. at 449
 
 ,
 
 100 S.Ct. 1759
 
 (White, J., dissenting). He continued, "[W]ho among us can honestly say that [the mother-in-law] did not feel 'torture' in her last sentient moments. ... What terror must have run through her veins as she first witnessed her daughter's hideous demise and then came to terms with the imminence of her own."
 
 Id.
 
 at 449-50,
 
 100 S.Ct. 1759
 
 .
 

 The dissent appears to contend that the Eighth Amendment component of Mr. Pavatt's sufficiency-of-the-evidence claim is procedurally barred because it was inadequately briefed in his direct appeal to the OCCA. But we decline to sua sponte address the issue of procedural bar. In district court the State said that Mr. Pavatt's Ground Ten had been "exhausted for purposes of federal habeas review." Response to Petition for Writ of Habeas Corpus at 128. In its response to that ground the State included substantial references to the Eighth Amendment constraints on aggravators. And although the State's brief on appeal argued procedural bar with respect to several of Mr. Pavatt's claims, it did not argue in its appellate brief that the sufficiency-of-the-evidence claim or any of its components was procedurally barred, nor did it argue procedural bar when questioned at oral argument about the insufficient-narrowing component of that claim. Likewise, the State has not objected to the Eighth Amendment component of Mr. Pavatt's sufficiency-of-the-evidence claim on the ground that our grant of COA did not encompass the issue. Of course, our opinion implicitly (and now explicitly) grants a COA if such a grant is necessary.
 

 Moreover, upholding the OCCA's construction of
 
 conscious physical suffering
 
 in this case as satisfying constitutional standards would be an "unreasonable application" of Supreme Court decisions.
 
 28 U.S.C. § 2254
 
 (d)(1). The Supreme Court's oft-applied principles governing aggravators that have been set forth above compels our conclusion in this case.