JOHNSON, J. (concurring)
¶ 49 While I generally concur with the majority's conclusions and its holding invalidating the death penalty, additional state constitutional principles compel this result. While the conclusions contained in the Beckett report[1] disclosing racial bias in the overall administration of capital punishment raise significant concerns, other additional constitutional factors have become more apparent, supporting the conclusion that the death penalty, as administered, is unconstitutional.
¶ 50 Article I, section 14[2] of our state constitution is the counterpart to the Eighth Amendment[3] to the United States Constitution. We have recognized, in limited situations, that this provision may provide greater constitutional protections than established under the Eighth Amendment. It is unnecessary to explore whether greater protections exist in this situation because, at the very least, our state constitution cannot provide for fewer protections than exist under the Eighth Amendment. What that means is that article I, section 14, at a minimum, embraces the same principles and concerns existing under the Eighth Amendment and, importantly, the same standard of review.
¶ 51 In State v. Cross , 156 Wash.2d 580, 132 P.3d 80 (2006), and State v. Davis , 175 Wash.2d 287, 290 P.3d 43 (2012), constitutional concerns were voiced in the dissenting opinions that centered on the randomness, unpredictability, and arbitrariness of the statewide administration of the death penalty system. Since the time those cases were decided, experience shows that the systemic constitutional concerns have deepened and continued moving toward increased rarity, randomness, arbitrariness, and overall statewide abandonment.
¶ 52 Based on a current review of the administration and processing of capital cases in this state, what is proved is obvious. A death sentence has become more randomly and arbitrarily sought and imposed, and fraught with uncertainty and unreliability, and it fails state constitutional examination.
¶ 53 Before analyzing the experiences evident in the administration of capital sentencing in this state, it is necessary to establish the required constitutional standard of review. Constitutional analysis is determined de novo. Conducting a constitutional interpretation, as is done in death penalty cases, is slightly different than more traditional constitutional review. As explained more specifically, constitutional analysis in death penalty review requires a broad, comparative approach. What this means is that we engage in a systemic view through a broader lens. In death penalty cases, while our statutory proportionality *643 review includes a comparability component, the statutory focus is more case specific as it relates to the defendant, his or her crime, and case specific circumstances, and under the statute it directs us to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."[4]
¶ 54 Importantly, under constitutional comparative review, the analysis incorporates an inspection of the entire system of capital sentencing to ensure constitutional requirements are satisfied. Cases from the United States Supreme Court not only establish the required constitutional review but also identify those minimum Eighth Amendment principles that must be satisfied. As noted previously, article I, section 14 can provide no less protection.
¶ 55 Reviewing some of the United States Supreme Court Eighth Amendment cases is helpful in emphasizing constitutional requirements. To begin, the Eighth Amendment case most often cited as establishing a "comparability analysis," i.e., reviewing a specific sentence and comparing that sentence with sentences imposed in other cases, is Weems v. United States , 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). In that case, the Court invalidated a sentence by essentially holding that the sentence so far exceeded what the Court found was proportionate for the crime, and compared the sentence in that case with those imposed in other situations. We have embraced similar reasoning under article I, section 14. See State v. Fain, 94 Wash.2d 387, 400, 617 P.2d 720 (1980). This comparability principle continues to guide United States Supreme Court Eighth Amendment review in death penalty and other sentencing situations.
¶ 56 An important aspect of Eighth Amendment comparative constitutional review requires this systemic-type analysis. Trop v. Dulles , 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion), is often cited as establishing the principle that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." What this means is that in conducting any constitutional analysis, the inquiry takes into consideration what is actually and currently taking place in the administration of the entire system-a much broader view than just the facts and circumstances of the case on review. What the Court looks to, in part, can be characterized as the "frequency" a death sentence or other sentences are sought or imposed in specific circumstances. This inquiry plays a significant role in determining the "evolving standards of decency" principle.
¶ 57 A brief review of how the United States Supreme Court cases have evolved best evidences this standard of review and the factors the Court has identified in its decisions.
¶ 58 In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), the Court, in affirming a death sentence, upheld a reenacted state statute that authorized capital punishment for six categories of crime: murder, kidnapping for ransom where the victim is harmed, armed robbery, rape, treason, and aircraft hijacking. The statute at issue also provided for an appellate inquiry on " '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' " Gregg, 428 U.S. at 167, 96 S.Ct. 2909 (quoting former GA. CODE ANN. § 27-2537(c)(3) (1973) ). While the Court upheld the statute and found that the penalty of death was not unconstitutional in all cases, it cited favorably to the principles established in Trop . Gregg, 428 U.S. at 173, 96 S.Ct. 2909. The Court in Gregg found the statute sufficiently narrowed the type of death penalty eligible crimes, added objectiveness to guide and narrow the fact finder's decision, and contained sufficient other procedural safeguards to survive constitutional scrutiny.
¶ 59 Since Gregg was decided, the United States Supreme Court, in a steady progression of cases, has narrowed its holding and limited the permissible constitutional authority of states to seek the death penalty for specific crimes and for specific defendants. An extensive review is unnecessary; however, *644 several cases highlight the reasoning and constitutional requirements.
¶ 60 In Godfrey v. Georgia , 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the United States Supreme Court reversed a death penalty. In doing so, the Court, quoting Furman,[5] stated, "[T]he penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. Gregg v. Georgia, supra, reaffirmed this holding." Godfrey, 446 U.S. at 427, 100 S.Ct. 1759. "A capital sentencing scheme must, in short, provide a ' "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." ' " Godfrey, 446 U.S. at 427, 100 S.Ct. 1759 (alteration in original) (quoting Gregg, 428 U.S. at 188, 96 S.Ct. 2909 (quoting Furman, 408 U.S. at 313, 92 S.Ct. 2726 (White, J., concurring) ) ).
¶ 61 In Enmund v. Florida , 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court invalidated state statutes authorizing the death penalty for defendants who aided and abetted a felony where a murder is committed by others and where the defendant does not kill or intend that a killing occur. Key to the Court's analysis was the determination that, nationally, few states authorized the death penalty under these circumstances, which under its view, reflected society's rejection of the death penalty for accomplice liability in felony murders. The Court observed:
In Gregg v. Georgia the [Supreme Court] observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." 428 U.S. at 183 [96 S.Ct. 2909] (footnote omitted). Unless the death penalty [in a specific case] measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment. Coker v. Georgia , [433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) ].
Enmund, 458 U.S. at 798, 102 S.Ct. 3368 (second alteration in original).
¶ 62 The United States Supreme Court's constitutional concerns continued to evolve and incorporate this type of inquiry, looking not only to "frequency" among the states' practices but also to identifiable trends.
¶ 63 In Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Court invalidated the death penalty for mentally retarded criminals. Significant to its holding was a statistical-type analysis that looked at not only the number of states (and Congress) that prohibited the execution of mentally retarded offenders but also the trend among the states. The Court reasoned, "It is not so much the number of these States that is significant, but the consistency of the direction of change." Atkins, 536 U.S. at 315, 122 S.Ct. 2242. The Court also expressed its view that
[o]ur independent evaluation of the issue reveals no reason to disagree with the judgment of "the legislatures that have recently addressed the matter" and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty.
Atkins, 536 U.S. at 321, 122 S.Ct. 2242. This concern surfaces in later cases.
¶ 64 In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Court invalidated the death penalty for juveniles under age 18, overruling its previous ruling in Stanford v. Kentucky , 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). In doing so, the Court relied not only on the analysis employed in Atkins in determining a national consensus and the consistency of the direction of change but also on a growing awareness of a lack of maturity for juveniles. The Court reasoned that this factor resulted in a diminished culpability of juveniles, which undermined the penological justifications of " ' "retribution and deterrence of capital crimes by prospective offenders." ' " Roper, 543 U.S. at 571, 125 S.Ct. 1183 (quoting *645 Atkins, 536 U.S. at 319, 122 S.Ct. 2242 (quoting Gregg, 428 U.S. at 183, 96 S.Ct. 2909 ) ).
¶ 65 Similar reasoning had supported the Supreme Court's invalidation of the death penalty for rape of an adult woman, Coker v. Georgia , 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982, and, later, for aggravated rape of a child, Kennedy v. Louisiana , 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008).
¶ 66 More recently, in analyzing mandatory life without possibility of parole sentences for juvenile offenders, the United States Supreme Court declared unconstitutional any such mandatory sentencing scheme for juveniles. In Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the Court analyzed the "evolving standards of decency" factor and found that although many state statutes authorized a life without parole sentence for juveniles convicted of nonhomicide crimes, since statistical surveys showed few states actually imposed such mandatory sentences, those statutes were unconstitutional. In Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), the Court, applying much of the analysis from Graham, invalidated sentencing statutes requiring a life without parole sentence for certain juvenile homicide convictions.
¶ 67 The lessons these cases teach us is that review of the constitutionality of the death penalty system must analyze the issue in contemporary terms and practices, and the constitutional analysis, at a minimum, must include a systemic determination of randomness, consensus, arbitrariness, frequency, reliability, trends, and penological justifications.
¶ 68 As indicated earlier, the United States Supreme Court cases interpreting the Eighth Amendment guide our state constitutional analysis and cannot be disregarded. Analysis under article I, section 14 must, at a minimum, proceed and apply those same principles. A significant difference when analyzing our state constitution is that we are not constrained by those principles of federalism that limit and guide United States Supreme Court analysis, where the Court considers national trends and practices. An analysis under article I, section 14 focuses on practices, trends, and experiences within our state.
Frequency, Arbitrariness, and Randomness
¶ 69 In order to conduct the article I, section 14 analysis under a similar analytical framework as employed by the United States Supreme Court, it is necessary to review what we know about the administration of our state capital sentencing system.
¶ 70 As referenced earlier in Cross, the dissent raised the concerns in constitutional terms over random, arbitrary, or capricious imposition of a death sentence emphasized in Furman and Cross . In addition to what was analyzed in that opinion, it is important to review what our state's experiences reflected at that time.
¶ 71 Shortly after Cross was decided, the Washington State Bar Association issued a final report of the death penalty subcommittee. See WASH. STATE BAR ASS'N, FINAL REPORT OF THE DEATH PENALTY SUBCOMMITTEE OF THE COMMITTEE ON PUBLIC DEFENSE (Dec. 2006)[6] (Final Report). Our current death penalty statute was enacted in 1981. As of 2006, the report discloses that a total of 254 death eligible aggravated murder cases were charged arising in 25 counties. The report observes the "data shows that most of the death penalty cases occur in a small number of counties.... Thus, death penalty cases have been brought in 17 of the 39 counties during the last 25 years and the death sentence has been imposed in 10 of those counties." Final Report at 12. A total of 30 death sentences were imposed from the 10 counties.
¶ 72 The report continues, revealing that of the 30 death sentence cases, 19 were reversed on appellate review and "nearly all have resulted in a sentence of life without the possibility of parole." Final Report at 8. Death sentences, including executions, at that time had arisen in 8 counties out of the 25 counties where death eligible crimes were charged.
*646 ¶ 73 In Davis, 175 Wash.2d 287, 290 P.3d 43, then Justice Fairhurst raised a similar concern, pointing out that since 2000, the only counties where death sentences had been imposed were King and Pierce, accounting for 5 death sentences in that 12-year span. Davis, 175 Wash.2d at 388, 290 P.3d 43 (Fairhurst, J, dissenting).[7]
¶ 74 Since 2006, about 131 additional death eligible aggravated murder cases have been brought. Executions themselves are extremely rare. Since 1987, five executions have occurred, three of which occurred when the defendants waived their right to challenge their convictions and sentences. No executions will take place in the near or foreseeable future based on Governor Jay Inslee's issuance of a reprieve against executions during his tenure.
¶ 75 No death penalties have been imposed since 2011. Currently, no pending prosecutions seeking the death penalty exist. During that same time, dozens, if not tens of dozens, of aggravated murder prosecutions have occurred. Since 2000, only three county prosecutors have filed death notices, and in two counties, death was imposed: Snohomish County in State v. Scherf (No. 95-1-02242-2) and King County in State v. Schierman (No. 06-1-06563-4). Apparently, based on many reasons, seeking the death penalty is not an option in the other 36 counties. Where a crime is committed is the deciding factor, and not the facts or the defendant.
¶ 76 The phrase often used where such infrequency is concerned is "the odds are similar to lightning striking an individual." This presents constitutional problems.
¶ 77 As is also revealed in the Final Report of 2006, approximately 300 aggravated murder convictions have been entered since 1981. Of this group, about 270 were death eligible. In about 80 cases, the prosecutor filed the death notice, and in about 30 cases, the jury imposed death. Five executions have taken place. Of the remaining cases, 19 were reversed on appeal and, on remand, the defendants were sentenced to life without parole (leaving 6 out of approximately 300).
¶ 78 Based on this report and what additional information we now have, it cannot be said that trials resulting in death sentences are reliable. Where the vast majority of death sentences are reversed on appeal and ultimately result in life without parole, reliability and confidence in the process evaporates.
¶ 79 What this systemic analysis discloses is clear. Since the opinions in Cross, and again in Davis, were filed, we know more about the administration of capital cases today. Importantly, a much more complete set of trial court reports exists. We also have death penalty prosecutions where the penalty was not imposed and others where the notice was withdrawn or never filed. We also have the governor's "reprieve," effectively halting executions for the foreseeable future. In the majority of our 39 counties, no death penalty has ever been sought. The current death row population arose from just 6 counties.
¶ 80 The trend is apparent and the indication clear that fewer county prosecutors elect to file a death notice. The death penalty simply does not exist as an option in the majority of the state's counties.
¶ 81 The concerns expressed in the dissents in Cross and Davis have grown and expanded. The number of counties where a death penalty prosecution is an option has been narrowed to, at most, three and may have currently been abandoned altogether by all counties.
¶ 82 The delay inherent in death sentence cases raises additional concerns, although much of the delay is a result of court review procedures. For example, Cal Brown, the most recent execution in 2010, committed his crime in 1991. Excepting the cases involving Schierman and Scherf, all other death row crimes arose in the 1990s. The governor's action means no executions will occur in the foreseeable future. Where such delay exists, penological purposes in a death sentence are diminished. We often say, "Justice delayed is justice denied," especially for the victims' surviving family. The unfortunate result of delay diminishes whatever sense of justice is *647 provided through an execution. As quoted earlier, the United States Supreme Court has recognized that where penological purposes cease to be promoted, the constitutional concerns expand.
¶ 83 Based on a review of the administration of death penalty cases, constitutional flaws have now become obvious. Under article I, section 14 of our state constitution, where a system exists permeated with arbitrary decision-making, random imposition of the death penalty, unreliability, geographic rarity, and excessive delays, such a system cannot constitutionally stand. The combination of these flaws in the system support our conclusion that the death penalty is unconstitutional. Although this analysis applies the constitutional principles analysis and requirements established by the United States Supreme Court, as it must, this analysis and conclusion rests on adequate and independent state constitutional principles. See Michigan v. Long , 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
Owens, J.
Madsen, J.
Stephens, J.

Katherine Beckett & Heather Evans, The Role of Race in Washington State Capital Sentencing , 1981-2014 (Oct. 13, 2014) [https://perma.cc/XPS2-74TR].

"EXCESSIVE BAIL, FINES AND PUNISHMENTS. Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."

"BAILS, FINES, AND PUNISHMENTS. Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

RCW 10.95.130(2)(b).

Furman v. Georgia , 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

https://www.wsba.org/docs/default-source/legal-community/committees/council-onpublic-defense/death-penalty-report.pdf?sfvrsn=120301f1_14 [https://perma.cc/S6C2-MUJK].

Report of Trial Judge (TR) 194 (Covell Thomas); TR 216 (Allen Gregory); TR 220 (Dayva Cross); TR 251 (Robert Yates Jr.); TR 303 (Conner Schierman).